**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| CAREFIRST OF MARYLAND, INC. et al.,<br><br>        Plaintiffs,<br><br>  v.<br><br>AMGEN INC. et al.,<br><br>        Defendants. | No. 2:24-cv-00484-AWA-LRL |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**THE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

Introduction .................................................................................................................1

Background....................................................................................................................5

I.       Immunex and Roche Research TNF Inhibitors....................................................5

II.      Immunex Receives FDA Approval for Enbrel and Enters into a License with
         Roche ..................................................................................................................6

III.     Amgen Acquires Immunex and Buys Out Its Running Royalty Obligation to
         Roche ..................................................................................................................7

IV.      Amgen Petitions the Patent Office to Issue Patent Claims Covering Etanercept ...............8

V.       A Federal Court Permanently Enjoins Marketing of the Sandoz and Bioepis
         Biosimilars ..........................................................................................................9

VI.      Plaintiffs File This Lawsuit Complaining That Biosimilar Versions of Enbrel
         Have Not Entered ............................................................................................11

Legal Standard .........................................................................................................12

Argument....................................................................................................................13

I.       Plaintiffs' Claims Fail Because Plaintiffs Have Not Alleged Actionable
         Exclusionary Conduct.......................................................................................14

         A.       The First Amendment Forecloses Antitrust Liability for Conduct That
                  Depends on Protected Petitioning............................................................14

         B.       Plaintiffs Cannot Avoid This Result by Framing the Challenged Conduct
                  as the License Alone .............................................................................18

II.      Plaintiffs' Claims Fail Because Their Alleged Injuries Resulted from Court
         Action .................................................................................................................21

Conclusion ..............................................................................................................23

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbott Laboratories v. Adelphia Supply USA*,
2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017)........................................................................22

*Advanced Health-Care Services, Inc. v. Radford Community Hospital*,
910 F.2d 139 (4th Cir. 1990) ...............................................................................................4

*American Sales Co., LLC v. Pfizer, Inc.*,
2015 WL 13264206 (E.D. Va. Nov. 6, 2015).......................................................................12

*Andrx Pharmaceuticals, Inc. v. Biovail Corp. International*,
256 F.3d 799 (D.C. Cir. 2001) ................................................................................... 5, 21, 23

*Asahi Glass Co. v. Pentech Pharmaceuticals, Inc.*,
289 F. Supp. 2d 986 (N.D. Ill. 2003)...................................................................................12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...............................................................................................................12

*Associated Bodywork & Massage Professionals v. American Massage Therapy
Ass'n*, 897 F. Supp. 1116 (N.D. Ill. 1995).............................................................................22

*Baltimore Scrap Corp. v. David J. Joseph Co.*,
237 F.3d 394 (4th Cir. 2001) ..........................................................................................3, 14

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ...............................................................................................................12

*Biltmore Co. v. NU U, Inc.*,
2016 WL 7494474 (W.D.N.C. Dec. 30, 2016).....................................................................13

*Brown v. Duchesne*,
60 U.S. (19 How.) 183 (1857) ..............................................................................................18

*In re Buspirone Patent Litigation*,
185 F. Supp. 2d 363 (S.D.N.Y. 2002)..................................................................................21

*California Motor Transport Co. v. Trucking Unlimited*,
404 U.S. 508 (1972) ...............................................................................................................14

*CareFirst of Maryland, Inc. v. Johnson & Johnson*,
2024 WL 3858249 (E.D. Va. Aug. 16, 2024)........................................... 19, 20, 21, 23

*Colonial Penn Insurance Co. v. Coil*,
  887 F.2d 1236 (4th Cir. 1989) ....................................................................................2

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ...................................................................................................21

*Eli Lilly & Co. v. Barr Laboratories, Inc.*,
  251 F.3d 955 (Fed. Cir. 2001).....................................................................................10

*Hospital Building Co. v. Trustees of the Rex Hospital*,
  691 F.2d 678 (4th Cir. 1982) ......................................................................................15

*In re Humira (Adalimumab) Antitrust Litigation*,
  465 F. Supp. 3d 811 (N.D. Ill. 2020), *aff'd sub nom. Mayor & City Council of
  Baltimore v. AbbVie Inc.*, 42 F.4th 709 (7th Cir. 2022) ............................................. 16, 17, 19

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
  527 F. Supp. 2d 1084 (N.D. Cal. 2007)...........................................................................20, 21

*Immunex Corp. v. Sandoz Inc.*:

  395 F. Supp. 3d 366 (D.N.J. 2019) ........................................................................... 2, 7, 10

  964 F.3d 1049 (Fed. Cir. 2020)................................................................................... 6, 10

*Intellectual Ventures I LLC v. Capital One Financial Corp.*,
  280 F. Supp. 3d 691 (D. Md. 2017) .......................................................................... 16, 17, 19

*Lawline v. American Bar Ass'n*,
  956 F.2d 1378 (7th Cir. 1992) .....................................................................................22

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) .......................................................................................18

*Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*,
  107 F.3d 1026 (3d Cir. 1997)......................................................................................22

*Mayor & City Council of Baltimore v. AbbVie Inc.*,
  42 F.4th 709 (7th Cir. 2022) .......................................................................................17

*McGuire Oil Co. v. Mapco, Inc.*,
  958 F.2d 1552 (11th Cir. 1992)....................................................................................20

*Mercatus Group, LLC v. Lake Forest Hospital*,
  641 F.3d 834 (7th Cir. 2011) .......................................................................................15

*North Carolina Electric Membership Corp. v. Carolina Power & Light Co.*,
  666 F.2d 50 (4th Cir. 1981) ..........................................................................................3

iii

*Nobelpharma AB v. Implant Innovations, Inc.*,
  141 F.3d 1059 (Fed. Cir. 1998)................................................................................14

*Novo Nordisk of North America, Inc. v. Genentech, Inc.*,
  77 F.3d 1364 (Fed. Cir. 1996)................................................................................18

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*,
  508 U.S. 49 (1993) .................................................................................................15

*RE/MAX LLC v. M.L. Jones & Associates, Ltd.*,
  2013 WL 4647517 (E.D.N.C. Aug. 29, 2013).......................................................13

*Sandoz Inc. v. Amgen Inc.*,
  582 U.S. 1 (2017).....................................................................................................9

*Sandoz Inc. v. Immunex Corp.*,
  141 S. Ct. 2623 (2021) ...........................................................................................10

*Sessions Tank Liners, Inc. v. Joor Manufacturing, Inc.*,
  17 F.3d 295 (9th Cir. 1994) ....................................................................................22

*Syngenta Crop Protection, LLC v. Atticus, LLC*,
  2022 WL 842938 (E.D.N.C. Mar. 21, 2022).........................................................13

*United Mine Workers of America v. Pennington*,
  381 U.S. 657 (1965) .........................................................................................*passim*

*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*,
  382 U.S. 172 (1965) ..........................................................................................15, 19

## STATUTES

15 U.S.C. § 2.............................................................................................................11

35 U.S.C. § 154(a) ....................................................................................................18

35 U.S.C. § 271(e)(4)(D)............................................................................................9

## REGULATORY MATERIALS

*In re Amgen Inc. & Immunex Corp.*,
  No. C-4053 (FTC July 12, 2002),
  www.ftc.gov/sites/default/files/documents/cases/2002/07/amgencomplaint.pdf....................7

## OTHER AUTHORITIES

Arthur Allen, *Drug Brokers Steer Americans to Humira over Cheaper Options*,
  L.A. Times, Sept. 18, 2023, at A8, *available at* 2023 WLNR 32177873 ...............................7

**INTRODUCTION**

In this antitrust lawsuit, Plaintiffs complain that they are unable to purchase two "biosimilar" alternatives to Immunex's drug ENBREL® (etanercept).  However, the sale of those drugs has been, and will continue to be, barred by injunctions issued by a federal court in the District of New Jersey, which found infringement of valid patents asserted by Immunex and its parent company, Amgen.  Thus, Plaintiffs' antitrust theory is that illegal competition by patent-infringing products has been excluded.

Plaintiffs' claims fail as a matter of law and must be dismissed with prejudice.  Under Supreme Court and Fourth Circuit precedent, the First Amendment protects Amgen's efforts (on behalf of its subsidiary, Immunex) to have the U.S. Patent and Trademark Office issue patents covering Enbrel biosimilars and Amgen's successful litigation to enforce those patents.[1] Plaintiffs cannot separate their claims from Amgen's protected activity—and even if they could, Plaintiffs make no factual allegations that any other conduct by Amgen excluded competition. After Amgen raised these arguments in its initial motion to dismiss, Plaintiffs amended their complaint to remove allegations and obscure the facts about Amgen's years of petitioning activity that are the basis of their claims.  But Plaintiffs cannot plead around the fundamental problem that their theory of antitrust liability hinges on conduct protected by the First Amendment: the successful prosecution and assertion of valid patents.  Separately, Plaintiffs' claims fail because the federal-court injunctions break the causal chain between Amgen's conduct and Plaintiffs' alleged harm.

---

[1] For simplicity, we generally use "Amgen" to refer to all Defendants when the differences among them are not material for purposes of this motion.

1

As Plaintiffs themselves allege, Enbrel is approved to treat rheumatoid arthritis and other autoimmune disorders affecting millions of Americans.  ECF No. 52, Second Amended Complaint ("Compl.") ¶¶ 50-55.[2]  Enbrel is a "biologic" medicine, meaning it is made in living cells.  Its active ingredient is an artificially engineered "fusion protein" called etanercept.  *Id.* ¶¶ 60, 68.  In 2004, Amgen entered into an agreement with Roche for an exclusive license to certain pending patent applications (and issued patents not at issue here) relating to technology that both companies had researched, including the responsibility to direct prosecution of the pending applications before the Patent Office.  *Id.* ¶¶ 7, 64, 101, 106.  Amgen then spent "about seven years" petitioning the Patent Office to issue patents from the pending applications.  *Id.* ¶ 119.  The Patent Office ultimately issued two patents, which will expire in 2028 and 2029.  *Id.* ¶¶ 119-123.

Amgen successfully enforced those two patents against infringing "biosimilar" products developed by Sandoz and Bioepis.  Amgen sued both companies for patent infringement in the U.S. District Court for the District of New Jersey—and won.  That court found that the biosimilars infringed valid patents, *Immunex Corp. v. Sandoz Inc.*, 395 F. Supp. 3d 366 (D.N.J. 2019), and it permanently enjoined the sale of those biosimilars until those patents expire.  ECF No. 49-1; ECF No. 49-2.[3]

These allegations fail to state a claim for two separate reasons.

*First*, Plaintiffs have failed to allege any actionable exclusionary conduct, and their attempt to rewrite their complaint to evade that deficiency has not succeeded.  As a matter of

---

[2] Citations of the Second Amended Complaint take Plaintiffs' allegations as true solely for purposes of this motion, as required by Rule 12(b)(6).

[3] Because these permanent injunctions are part of the court record from the patent-infringement lawsuits, the Court can take judicial notice of them.  *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989).

law, the *Noerr-Pennington* doctrine—"guarantee[ing] citizens their First Amendment right to petition the government for redress without fear of antitrust liability"—protects Amgen's years of work petitioning the Patent Office to issue patents and its successful lawsuits enforcing those patents in the federal courts. *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 398 (4th Cir. 2001); *N.C. Elec. Membership Corp. v. Carolina Power & Light Co.*, 666 F.2d 50, 52 (4th Cir. 1981). The Supreme Court has held that such protected activity "is not illegal" even if "part of a broader scheme." *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965). Accordingly, the First Amendment forecloses liability for the entire series of events alleged in the operative Complaint that resulted in biosimilar versions of Enbrel not being able to enter the market.

Plaintiffs appear to recognize that fatal flaw. In their First Amended Complaint, Plaintiffs alleged that the exclusive license, Amgen's patent prosecution, and the successful lawsuits were part of the alleged "anticompetitive scheme." ECF No. 40, ¶ 200. After Amgen moved to dismiss on the ground that such First-Amendment protected activity "is not illegal" even if "part of a broader scheme," *Pennington*, 381 U.S. at 670, Plaintiffs amended their complaint to try to obscure the role of the patent prosecution and enforcement in the "scheme." Plaintiffs now allege that the license to the patent applications "was the violation of the antitrust laws" and that Amgen's "prosecution" and "enforcement" efforts only "caused anticompetitive harm" somehow without being part of the "scheme." Compl. ¶ 198.

But the First Amendment's protection for petitioning activity cannot be evaded through wordplay. Regardless of labels, the fact remains that the alleged antitrust claim centers on the prosecution and enforcement of two patents. There is no allegation that the license *standing alone* was a "violation of the antitrust laws" because Plaintiffs still do not (and cannot) allege

that the license alone gave Amgen any rights to exclude biosimilar versions of Enbrel.  Plaintiffs thus cannot show that the license itself constituted exclusionary conduct creating an antitrust claims.  *See Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990) ("exclusionary" conduct is an essential element of a monopolization claim).

Notably, in their First Amended Complaint, Plaintiffs specifically alleged just the opposite—that the patents and applications licensed by Roche to Amgen did not have any exclusionary effect because they "*did not cover etanercept*" at the time of the license.  ECF No. 40, ¶ 117.  That was such a key allegation that Plaintiffs italicized the point.  The First Amended Complaint explained that Amgen "substantially rewrote" the patent applications, "reshap[ing] them to cover Enbrel" and exclude biosimilar products.  *Id.* ¶ 119.  When Amgen argued in its motion to dismiss that this meant that the antitrust claim challenged First Amendment-protected content, Plaintiffs amended their complaint to delete what they had previously italicized to emphasize the point that Roche's patent applications did not cover etanercept.  Critically, Plaintiffs have not alleged the contrary in their Second Amended Complaint.  They have not alleged that the Roche license gave Amgen any rights to exclude biosimilar versions of Enbrel. The Complaint continues to allege instead that Amgen gained the power to exclude biosimilars only through its protected petitioning of the Patent Office, which included amending the patent applications five times, overcoming the patent examiner's rejections on multiple grounds, and taking a "successful appeal to the Board of Patent Appeals." *Id.* ¶¶ 120-122.  The First Amendment therefore forecloses any antitrust claim based on Amgen's license of the Roche patent applications as a matter of law.

**Second**, the Complaint fails to state a claim because the two federal-court injunctions are an independent cause of any lack of competition from biosimilar versions of etanercept.  When

4

"anticompetitive harm is caused by the decision of a court, even though granted at the request of a private party, no private restraint of trade occurs because the intervening government action breaks the causal chain." *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 818 (D.C. Cir. 2001). Here, permanent injunctions by the U.S. District Court for the District of New Jersey prohibit companies from marketing the two FDA-approved biosimilar products. Thus, to the extent Plaintiffs allege that they paid inflated prices for Enbrel because Enbrel did not face competition from biosimilars, the federal-court injunctions prohibiting the sale of those biosimilars are the independent cause of that alleged harm. Plaintiffs are improperly asking this Court to nullify permanent injunctions issued by the District of New Jersey and affirmed by the Federal Circuit.

These deficiencies in Plaintiffs' claims require dismissal with prejudice. Plaintiffs cannot plead facts showing that Defendants took a license to exclusionary power that Roche never had, or that would negate the First Amendment protection for Defendants' petitioning the Patent Office and winning patent-infringement lawsuits. Nor could further amendments to the Complaint wipe away the permanent injunctions issued by another federal court that break the chain of causation.

## BACKGROUND

### I.    Immunex and Roche Research TNF Inhibitors

Tumor necrosis factor ("TNF") is a chemical messenger that activates inflammation in the body when it binds to receptors called tumor necrosis factor receptors ("TNFRs"). Compl. ¶¶ 58-59. Excess TNF can cause autoimmune disorders such as rheumatoid arthritis, plaque psoriasis, psoriatic arthritis, ankylosing spondylitis, and polyarticular juvenile idiopathic arthritis. *Id.* ¶ 58.

5

In the 1990s, researchers at two different pharmaceutical companies, Roche and Immunex, were studying how synthetic proteins containing fragments of TNFRs could bind to and "soak up" TNF, lowering the amount in the body and reducing the inflammation that excessive TNF causes. *Id.* ¶¶ 61-72; *Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1054-55 (Fed. Cir. 2020) (recounting this history). Some of that research involved fragments of a TNFR called p55 (because its molecular weight is 55 kilodaltons); other research involved fragments of a TNFR called p75 (because its molecular weight is 75 kilodaltons). Compl. ¶¶ 62-72. For a number of years, Roche prioritized approaches using p55 TNFR, and Immunex prioritized approaches using p75 TNFR. *Id.* ¶¶ 66-67.

Both Roche and Immunex applied for patents on technologies related to TNFRs. In 1990, Roche filed a European patent application related to TNFRs, and in 1993, it filed a U.S. patent application for inventions related to both p55 TNFR and p75 TNFR. *Id.* ¶ 66. In 1995, Roche filed U.S. Patent Application No. 08/444,790 (the "'790 application") and U.S. Patent Application No. 08/444,791 (the "'791 application"). *Id.*

## II.    Immunex Receives FDA Approval for Enbrel and Enters into a License with Roche

Immunex developed a TNFR-based treatment called Enbrel, which received FDA approval in 1998. *Id.* ¶¶ 50, 73. Enbrel is a biologic medicine approved to treat autoimmune disorders—specifically, rheumatoid arthritis, plaque psoriasis, psoriatic arthritis, ankylosing spondylitis, and polyarticular juvenile idiopathic arthritis. *Id.* ¶ 50. Enbrel's active ingredient is a fusion protein known as etanercept, which contains a portion of the p75 TNFR protein. *Id.* ¶ 60. Enbrel reduces inflammatory responses by binding to and inhibiting TNF. *Id.* ¶¶ 58-59. Immunex launched Enbrel in the United States on November 6, 1998. *Id.* ¶ 73.

In 1999, Roche granted Immunex a co-exclusive license under the family of patent applications relating to the 1990 European application to make, use, sell, and import etanercept.

6

*Id.* ¶ 77; ECF No. 52-1, § 2.1.  This family of patent applications, along with any patents issuing from them, was known as the "Brockhaus" patent rights because Dr. Manfred Brockhaus was the first named inventor.  *Immunex*, 395 F. Supp. 3d at 377 n.2.  In exchange for the license, Immunex agreed to pay Roche a royalty on its net sales of etanercept.  Compl. ¶ 79.  Immunex also granted Roche an option to take a royalty-bearing license under a patent family controlled by Immunex, to make, use, sell, and import a p55 TNFR product.  ECF No. 52-1, § 2.2.

### III.    Amgen Acquires Immunex and Buys Out Its Running Royalty Obligation to Roche

In 2002, Amgen acquired Immunex.  Compl. ¶ 85.  The Federal Trade Commission ("FTC") reviewed that transaction for potential antitrust issues.  *Id.* ¶ 89.  According to the FTC's submissions following its review of the transaction, Enbrel competes in a market for "the research, development, manufacture, and sale of TNF Inhibitors," which included a product being developed by Abbott Laboratories.  Complaint ¶ 25, *In re Amgen Inc. & Immunex Corp.*, No. C-4053 (FTC July 12, 2002), www.ftc.gov/sites/default/files/documents/cases/2002/07/amgencomplaint.pdf, *cited in* Compl. ¶ 90 n.38.  Abbott later launched that product under the name Humira, "another autoimmune drug used to treat similar conditions as Enbrel."  Compl. ¶ 160.  Humira went on to become the "bestselling drug in history."  Arthur Allen, *Drug Brokers Steer Americans to Humira over Cheaper Options*, L.A. Times, Sept. 18, 2023, at A8, *available at* 2023 WLNR 32177873.  Thus, although Plaintiffs here allege that Enbrel competes only with biosimilar versions of Enbrel, Compl. ¶ 192, the FTC asserted that Enbrel competes with Humira and other drugs that treat the same condition.[4]

In June 2004, Roche and Amgen signed an agreement titled Accord and Satisfaction, "to eliminate the continuing obligations to pay royalties to Roche" under the 1998 license.  *Id.*

---

[4] Whether Enbrel and Humira compete in the same antitrust market is not at issue in this motion.

¶¶ 102-103; ECF No. 52-2.  In that agreement, Roche obtained a large up-front payment instead of ongoing royalty payments.  Compl. ¶ 103.  Roche also granted Amgen an exclusive license to the Brockhaus patent rights in the United States.  *Id.* ¶¶ 105-106.  Roche retained the Brockhaus patent rights for internal research.  *Id.* ¶ 105.  Although the Complaint in passing calls Roche a "would-be competitor" had it not exclusively licensed the Brockhaus patent rights to Amgen, *id.* ¶ 1, the Complaint does not allege that Roche ever succeeded in developing or received FDA approval of an etanercept product or any other TNF inhibitor.

It is critical to distinguish among (i) the *issued patents* licensed to Amgen, (ii) the patent *applications* licensed to Amgen (which the complaint calls the "Brockhaus Patent Applications"), and (iii) the patents that Amgen obtained from the Patent Office based after rewriting those applications (which the complaint calls the "Brockhaus Patents").  *Id.* ¶ 64.  The already-issued patents licensed to Amgen are not at issue here.  *See* ECF No. 52-2, PageID# 764 (exhibit to the Accord and Satisfaction listing the already-issued patents in the right-most column).  As for the licensed applications, the Complaint does not allege that they covered Enbrel at the time of the exclusive license.  Nor could Plaintiffs make such an allegation, given that they previously alleged (with liberal use of emphatic italics) that Roche's pending patent claims "did not cover etanercept" until Amgen "rewrote" them.  ECF No. 40, ¶¶ 117, 119, 155 (emphases omitted).  Thus, the Complaint makes no allegation that Roche's license itself gave Amgen any right to exclude etanercept products, or that Roche owned any patents covering etanercept, when it exclusively licensed its patent rights to Amgen.

**IV.    Amgen Petitions the Patent Office to Issue Patent Claims Covering Etanercept**

Amgen spent "about seven years" petitioning the Patent Office to grant patents on etanercept from the patent applications.  Compl. ¶ 119.  That effort required Amgen to amend Roche's patent applications five times, overcome "reject[ions]" by the patent examiner "for

8

obviousness and insufficient written description," and take a "successful appeal to the Board of Patent Appeals." *Id.* ¶¶ 120-122.  In 2011, seven years after the Accord and Satisfaction, the Patent Office granted a patent from one of the Brockhaus applications as U.S. Patent No. 8,063,182 (the "'182 patent").  *Id.* ¶ 121.  In 2012, the Patent Office granted another of the Brockhaus applications as U.S. Patent No. 8,163,522 (the "'522 patent").  *Id.* ¶ 123.  The '182 and '522 patents will expire in 2028 and 2029, respectively.  *Id.* ¶¶ 121, 123.

**V.      A Federal Court Permanently Enjoins Marketing of the Sandoz and Bioepis Biosimilars**

Under legislation passed in 2010, a company may apply to the FDA for approval of a biosimilar.  A biosimilar "is a biologic product that is highly similar to a biologic product that has already been approved," which is known as a reference product.  *Sandoz Inc. v. Amgen Inc.*, 582 U.S. 1, 5 (2017).  FDA approval of a biosimilar does not necessarily mean that the biosimilar can lawfully be sold.  The sponsor of the reference product "may hold multiple patents covering the biologic, its therapeutic uses, and the processes used to manufacture it," which "may constrain [the biosimilar] applicant's ability to market its biosimilar."  *Id.* at 7.  The statute "sets forth a carefully calibrated scheme for preparing to adjudicate, and then adjudicating, claims of infringement."  *Id.* at 8.  In some circumstances, a reference product sponsor that prevails in a patent-infringement lawsuit against a biosimilar sponsor is automatically entitled to a permanent injunction prohibiting commercialization of the biosimilar until the patent expires. *Id.* at 10; 35 U.S.C. § 271(e)(4)(D).

In 2015, Sandoz applied to the FDA to market Erelzi, a biosimilar version of etanercept. Compl. ¶ 127.  In 2016, Amgen filed a lawsuit against Sandoz in the U.S. District Court for the District of New Jersey alleging that Erelzi infringed the '182 and '522 patents (among others). *Id.* ¶ 128.  In August 2016, the FDA approved Erelzi, but Sandoz chose not to launch the product

at risk of being found liable to Amgen for damages for infringing the patents. *Id.* ¶¶ 130-131. The district court held a two-week trial in September 2018. *Immunex*, 395 F. Supp. 3d at 374. Sandoz did not contest that Erelzi infringed the '182 and '522 patents, but argued that the patents were invalid. *Id.* at 375. One of Sandoz's arguments invoked the doctrine of "obviousness-type double patenting," which prohibits a patent from claiming an obvious variation of (*i.e.*, subject matter "not patentably distinct from") a "commonly owned earlier patent." *Eli Lilly & Co. v. Barr Lab'ys, Inc.*, 251 F.3d 955, 967 (Fed. Cir. 2001). The purpose of that doctrine is to prevent an "unjustified timewise extension of the right to exclude." *Id.* at 968. The New Jersey court rejected that argument and found the patents valid. Compl. ¶ 133; *Immunex*, 395 F. Supp. 3d at 408-23.

On the basis of its ruling in Amgen's favor, the district court permanently enjoined Sandoz from making, using, selling, or importing Erelzi or any other product containing etanercept until the '182 and '522 patents expire. ECF No. 49-1. The Federal Circuit affirmed. Compl. ¶ 135; *Immunex*, 964 F.3d at 1053. The Supreme Court denied certiorari. Compl. ¶ 136; *Sandoz Inc. v. Immunex Corp.*, 141 S. Ct. 2623 (2021).

Samsung Bioepis Co., Ltd. ("Bioepis") developed Eticovo, another biosimilar version of etanercept. The FDA approved Eticovo on April 25, 2019. Compl. ¶ 139. On April 30, 2019, Amgen filed a lawsuit against Bioepis in the District of New Jersey alleging that Eticovo infringed the '182 and '522 patents (among others), *id.* ¶ 140, where the case was assigned to the same district judge who had presided over the trial in the Sandoz case. After the Federal Circuit affirmed that district court's rejection of Sandoz's invalidity arguments and the Supreme Court denied certiorari in 2021, the district court permanently enjoined Bioepis from making, using,

10

selling, or importing Eticovo or any other product containing etanercept until the '182 and '522 patents expire. *Id.* ¶ 142; ECF No. 49-2.

Accordingly, today, federal-court injunctions prohibit Sandoz and Bioepis from marketing biosimilar versions of etanercept in the United States.

## VI.   Plaintiffs File This Lawsuit Complaining That Biosimilar Versions of Enbrel Have Not Entered

Plaintiffs' theory is that Amgen's conduct unlawfully "prevent[ed] competition from biosimilar versions of" Enbrel. Compl. ¶ 4. The operative Complaint, like the previous complaint, alleges four counts. Count 1 seeks declaratory and injunctive relief under section 2 of the Sherman Act, 15 U.S.C. § 2. Compl. ¶¶ 213-227. Count 2 asserts claims under the antitrust laws of 31 states and the District of Columbia. *Id.* ¶¶ 228-246. Count 3 asserts claims under the consumer protection laws of 36 states and the District of Columbia. *Id.* ¶¶ 247-487. Count 4 asserts claims for unjust enrichment under the laws of 49 states and the District of Columbia. *Id.* ¶¶ 488-711.

As discussed above, Plaintiffs' First Amended Complaint alleged in italics that the claims in the patent applications originally did not cover etanercept, and that Amgen engaged in an anticompetitive "scheme" to "rewr[ite]" and "reshape[]" those patent applications, prosecuting them "relentlessly for nearly a decade" until the Patent Office granted the '182 and '522 patents. ECF No. 40, ¶¶ 117, 119. Plaintiffs' Second Amended Complaint removes the allegation that the patent applications did not cover etanercept and scrubs the word "scheme," instead characterizing the license itself as a "violation of the antitrust laws" and labeling the patent prosecution and judicial enforcement activity as "cause[s] of harm." Compl. ¶ 198.

11

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Satisfying that burden "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A legal conclusion couched as a factual allegation—such as an assertion that a defendant committed an unlawful act—is "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 678-80. Moreover, a complaint alleging "facts that are 'merely consistent with' a defendant's liability" fails Rule 12(b)(6) because it shows only a possible claim, not a plausible one. *Id.* at 678.

With respect to antitrust claims in particular, the Supreme Court has urged courts to dismiss claims that do not show a plausible entitlement to relief on the merits. Because "antitrust discovery can be expensive," it is "only by taking care to require allegations that reach the level suggesting" a violation that a court can "hope to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal relevant evidence'" to support a claim. *Twombly*, 550 U.S. at 558-59 (alteration in original). Thus, "some threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase." *Asahi Glass Co. v. Pentech Pharm., Inc.*, 289 F. Supp. 2d 986, 995 (N.D. Ill. 2003) (Posner, J.), *quoted in Twombly*, 550 U.S. at 558.

As this Court recognized in *American Sales Co., LLC v. Pfizer, Inc.*, 2015 WL 13264206, at *4 n.4 (E.D. Va. Nov. 6, 2015), the *Noerr-Pennington* doctrine is a basis to dismiss an antitrust complaint on the pleadings as long as the relevant facts are pled in the complaint or

12

subject to judicial notice. *See, e.g.*, *Biltmore Co. v. NU U, Inc.*, 2016 WL 7494474, at *3-4 (W.D.N.C. Dec. 30, 2016) (dismissing counterclaims under *Noerr-Pennington* doctrine at the Rule 12(b)(6) stage); *RE/MAX LLC v. M.L. Jones & Assocs., Ltd.*, 2013 WL 4647517, at *3-4 (E.D.N.C. Aug. 29, 2013) (same); *Syngenta Crop Prot., LLC v. Atticus, LLC*, 2022 WL 842938, at *3-5 (E.D.N.C. Mar. 21, 2022) (same, because "the facts alleged in [the] counterclaims . . . contain facts sufficient to resolve whether the *Noerr-Pennington* doctrine applies").

## ARGUMENT

Plaintiffs' federal and state law claims are premised on the same theory. Compl. ¶ 217 (Count 1); *id.* ¶¶ 231-233 (Count 2); *id.* ¶¶ 249-252 (Count 3); *id.* ¶¶ 488-490 (Count 4). Plaintiffs allege "exclusionary, anticompetitive conduct that was designed to create and maintain Amgen's improper monopoly over etanercept and exclude or substantially exclude its biosimilars from the market." *Id.* ¶ 230. In particular, Plaintiffs allege that Amgen "(i) willfully and unlawfully maintained and extended its monopoly power in the U.S. market for etanercept through the unlawful acquisition of the Brockhaus Patent Rights, and then by reason of that acquisition, (ii) prosecuted the [Brockhaus] '790 and '791 Applications to obtain the '182 and '552 Patents, and (iii) used those patents to buttress and entrench its monopoly and delay competition from would-be etanercept biosimilar competitors." *Id.* ¶ 198. Plaintiffs do not allege, however, that Roche's licensing of the "Brockhaus Patent Rights" itself provided Amgen with any ability to block the biosimilar drugs at issue here. According to the Complaint, Amgen obtained the right to stop sales of biosimilars only through rewriting the licensed applications and nearly a decade of petitioning efforts at the Patent Office, followed by successfully petitioning the federal courts to enforce those patents.

The First Amendment protects both forms of petitioning. And without the protected petitioning, nothing is left of Plaintiffs' allegations. Putting aside that a claim focusing solely on

13

a 20-year-old license would be time-barred, the Complaint concedes that the license, as distinct from Amgen's petitioning the Patent Office to grant patents and petitioning the courts to enforce them, did not block competition or provide Amgen with the power to do so.

Plaintiffs also fail to state a claim for an additional and independent reason: their alleged injury was caused by federal-court injunctions, not by Amgen.  Plaintiffs claim that they paid inflated prices for Enbrel because Enbrel did not have to compete with biosimilars, but the District of New Jersey's injunctions are the reason that the biosimilars for etanercept are not on the market.  The federal court's decisions to issue injunctions break the causal chain as a matter of law.

## I.      Plaintiffs' Claims Fail Because Plaintiffs Have Not Alleged Actionable Exclusionary Conduct

### A.      The First Amendment Forecloses Antitrust Liability for Conduct That Depends on Protected Petitioning

"The *Noerr-Pennington* doctrine guarantees citizens their First Amendment right to petition the government for redress without fear of antitrust liability."  *Baltimore Scrap*, 237 F.3d at 398.  The "right to petition extends to all departments of the Government," *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972), including petitioning the Patent Office to issue patents, *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068-71 (Fed. Cir. 1998), and filing lawsuits in the courts, *Baltimore Scrap*, 237 F.3d at 399 ("*Noerr-Pennington* immunity from antitrust laws extends to petitioning the courts as well.").

The First Amendment bars liability for petitioning even when it is designed and intended to harm competition.  An "anticompetitive purpose" does not make "attempts to influence public officials" illegal even if the defendant's "sole purpose" is to "destroy" competitors and "the resulting official action damaged other competitors at whom the campaign was aimed." *Pennington*, 381 U.S. at 669.

None of the narrow exceptions to the First Amendment's protections applies here. First, the *Noerr-Pennington* doctrine does not protect fraudulent enforcement of a patent, such as when a patent is obtained by "knowing and willful fraud" and then enforced with knowledge of that fraud. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 179 (1965). But Plaintiffs do not allege that Amgen committed any fraud in connection with its patent prosecution or enforcement efforts. Second, the First Amendment does not protect "sham" litigation, but Plaintiffs concede that Amgen's patent-infringement lawsuits succeeded on the merits: a federal district court in New Jersey found in favor of Amgen and issued permanent injunctions against both Sandoz and Biogen. Compl. ¶¶ 137-138, 144. A successful lawsuit is "by definition a reasonable effort at petitioning for redress and therefore not a sham." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 61 (1993).

Amgen's First Amendment immunity for its petitioning of the Patent Office and of a federal court forecloses liability for the series of events challenged in the Complaint. The Supreme Court has made clear that constitutionally protected petitioning activity "is not illegal" even "*as part of a broader scheme* itself violative of the Sherman Act." *Pennington*, 381 U.S. at 670 (emphasis added). The Fourth Circuit has confirmed that even "[i]f the courts are used or litigation is filed as part of an overall scheme to attempt to monopolize or exclude competition from the marketplace or otherwise violate the antitrust laws, that conduct" still enjoys antitrust immunity. *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 691 F.2d 678, 688 (4th Cir. 1982). Plaintiffs cannot impose liability on Amgen's petitioning activity by combining it with non-immunized conduct. Courts do not "aggregate the effects of conduct immunized from antitrust liability with the effects of conduct not so immunized" because doing so "would nullify the immunity." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 839 (7th Cir. 2011).

15

The decision of another district court in this Circuit in *Intellectual Ventures I LLC v. Capital One Financial Corp.*, 280 F. Supp. 3d 691 (D. Md. 2017), is instructive.  In that case, Capital One filed an antitrust counterclaim against Intellectual Ventures challenging its "acquir[ing]" patents from other entities on "technology essential to the types of services offered by commercial banks."  *Id.* at 696.  But Capital One could not show an anticompetitive effect solely through the asset acquisitions; it could "establish this effect" only by "rel[ying] on" Intellectual Ventures' "purported 'campaign'" of asserting some of its patents in court.  *Id.* at 706.  Like Amgen's patent-infringement lawsuits against Sandoz and Bioepis, Intellectual Ventures' campaign of patent-infringement lawsuits "was not sham litigation."  *Id.* at 716.  The court thus dismissed the *entire* antitrust claim because the litigation was "integral to Capital One's antitrust claims," *id.*, and Intellectual Ventures' "purported [anticompetitive] 'campaign[]' . . . could not succeed absent" the protected petitioning activity.  *Id.* at 706.

The court in *In re Humira (Adalimumab) Antitrust Litigation* similarly dismissed antitrust claims involving an alleged scheme to obtain and enforce valid patents relating to Humira, a product that competes with Enbrel.  In that case, AbbVie was accused of obtaining and then enforcing a so-called "thicket" of patents to prevent the sale of biosimilar versions of Humira.  *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811 (N.D. Ill. 2020), *aff'd sub nom. Mayor & City Council of Baltimore v. AbbVie Inc.*, 42 F.4th 709 (7th Cir. 2022).  The court found that "what plaintiffs allege[d] to be the heart of their monopolization claim" was "not immunized by the *Noerr-Pennington* doctrine."  *Id.* at 834.  Nonetheless, because the alleged scheme was also dependent on non-sham patent litigation protected by the First Amendment, the entire claim was subject to dismissal.  The court explained that "the entirety of [the] alleged monopolization scheme [was] immune, because plaintiffs' theory depends on all the components

16

of AbbVie's conduct"—including the non-sham patent litigations—"as the means to suppress competition." *Id.*

The same is true here. As in *Intellectual Ventures* and *Humira*, any alleged effect on competition depends on Amgen's protected activity. Plaintiffs do not allege that Enbrel was covered by any of Roche's patents or patent applications at the time of their license to Amgen. On the contrary, Plaintiffs allege that Amgen needed "about seven years" to overcome "reject[ions] . . . for obviousness and insufficient written description" and prevail in an "appeal to the Board of Patent Appeals" in order for the '182 and '522 patents to issue. Compl. ¶¶ 119-123. Plaintiffs' prior Complaint went into explicit details about how Roche's pending patent claims "*did not cover etanercept*" until Amgen obtained the right to prosecute the applications and "rewrote" the pending claims. ECF No. 40, ¶¶ 117, 119, 155. While Plaintiffs have removed some of those details from the First Amended Complaint in the hopes of skirting the arguments raised in Amgen's original motion to dismiss, the only allegations in the current Complaint about when Amgen gained the ability to exclude biosimilars still relate to Amgen's successful petitioning efforts before the Patent Office. *See* Compl. ¶¶ 117-124 (allegations about Amgen's successful prosecution of the patent applications that issued as the '182 and '522 patents); *id.* ¶¶ 125-143 (allegations about Amgen's successful enforcement of the '182 and '522 patents, which "block[ed] biosimilar entrants . . . for etanercept").

Plaintiffs' failure to allege that the patent applications Amgen licensed from Roche conferred the power to exclude biosimilar etanercept products is fatal because "[p]atent applications, successful or not, do not impose costs on rivals; only issued patents do so." *Mayor & City Council of Baltimore*, 42 F.4th at 714. The "right to exclude others from making, using, offering for sale, or selling [an] invention" does not "begin" until "the date on which the patent

17

issues." 35 U.S.C. § 154(a). That principle has been engrained in the patent laws for over 150 years. *See Brown v. Duchesne*, 60 U.S. (19 How.) 183, 195 (1857) ("[A]n inventor has no right of property in his invention, upon which he can maintain a suit, unless he obtains a patent.").

Plaintiffs' observation that the claims of the '182 and '522 patents "were supported" by the "original specification" that Roche filed before entering into the exclusive license agreement adds nothing. Compl. ¶¶ 120, 122. Exclusive rights are demarcated by a patent's claims, not by a patent's or patent application's specification. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims."); *Novo Nordisk of N. Am., Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1369 (Fed. Cir. 1996) ("The claims, however, not the specification, measure the protected patent right to exclude others."). Filing a patent application that can "support" a claim to an invention does not provide the patent applicant with any right to exclude others from practicing the invention.

In short, Plaintiffs allege that Amgen was able to prevent biosimilar competition ***only*** through protected activities: petitioning the Patent Office and petitioning the federal courts. Absent that protected activity, Amgen could not have excluded biosimilars. And such protected activity "is not illegal" even if "part of a broader scheme itself violative of the Sherman Act." *Pennington*, 381 U.S. at 670.

### B.    Plaintiffs Cannot Avoid This Result by Framing the Challenged Conduct as the License Alone

Plaintiffs' wordplay, such as editing the word "scheme" out of their complaint, does not avoid the clear legal rule that the First Amendment forecloses antitrust liability for a course of conduct that includes petitioning the government. No matter how they frame their antitrust allegations, Plaintiffs cannot avoid the reality that their theory of competitive harm depends on

18

protected activity—namely, Amgen's petitioning the Patent Office and a federal court.  Without that activity, there is no alleged exclusion, and therefore the rule that protected activity is not actionable as "part of a broader scheme" still applies.  As in *Intellectual Ventures* and *Humira*, Amgen "could not succeed" in excluding competition without engaging in protected activity. *Intell. Ventures*, 280 F. Supp. 3d at 706.  That is, any exclusion of competition "depends on" protected activity "as the means to suppress competition."  *Humira*, 465 F. Supp. 3d at 834.

Plaintiffs also cannot wedge this case into alignment with Judge Walker's decision in *CareFirst of Maryland, Inc. v. Johnson & Johnson*, 2024 WL 3858249 (E.D. Va. Aug. 16, 2024), by recharacterizing Amgen's petitioning of the Patent Office and successful litigation as having "caused anticompetitive harm."  Compl. ¶ 198.  Critically, the plaintiffs in *Johnson & Johnson* "sufficiently alleged *Walker Process* fraud" in prosecuting some of the patents at issue, piercing Johnson & Johnson's First Amendment immunity.  *Johnson & Johnson*, 2024 WL 3858249, at *11.  But there is no analogous allegation here.

Further, the *Johnson & Johnson* plaintiffs also challenged the defendant's enforcement of patents that it acquired from a third party, Momenta.  Unlike in this case, those patents conferred the power to block competition from biosimilars *at the time they were acquired*.  *Id.* (explaining that the acquired "patent portfolio included four patents covering technologies used to manufacture biosimilars").  Johnson & Johnson therefore did not need to petition the Patent Office with respect to the rights that it acquired from Momenta.  In other words, the plaintiffs in that case alleged that Johnson & Johnson obtained the right to exclude biosimilar competitors *through the acquisition itself*; thus, Johnson & Johnson's alleged ability to exclude competition did not depend on prosecution of the rights that it acquired.  On those facts, Judge Walker held that *Noerr-Pennington* did not bar the plaintiffs' claims.  Because the "plaintiffs' basis for

19

antitrust *liability* is the acquisition of the Momenta patents" that itself enabled Johnson & Johnson to exclude competition, the Court found that later "enforcement lawsuits only constitute" the cause of the plaintiffs' "antitrust *injury*" from the exclusion created by the acquisition. *Id.* at \*15. In other words, Judge Walker held that Johnson & Johnson's unimmunized acquisition of the Momenta patents was sufficiently alleged to be independently anticompetitive. In those circumstances, the fact that Johnson & Johnson's enforcement of the patents was part of the causal chain that led to the exclusion of biosimilars and allegedly higher prices did not negate liability for the independently anticompetitive acquisition of patents.

The *Johnson & Johnson* case does not stand for the proposition that *any* combination of immunized activity and prior unimmunized activity can be actionable whenever the immunized activity is labeled the "cause" of the higher prices paid by the plaintiffs. To the contrary, Judge Walker's opinion recognized that immunized conduct such as bringing patent-infringement "litigation is *not* antitrust injury when there was no separate predicate anticompetitive act." *Id.* (emphasis added) (citing *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1564 (11th Cir. 1992)). That is exactly the situation here. As explained in another case on which Judge Walker relied, before a court can "ask whether the accused patent litigation was causally connected to these anticompetitive harms," the court "must first find that the other aspects of the scheme independently produce anticompetitive harms." *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007), *cited in Johnson & Johnson*, 2024 WL 3858249, at \*15. Because Plaintiffs here, unlike the plaintiffs in *Johnson & Johnson*, do not (and cannot) allege that the license itself gave Amgen any power to block biosimilar competition, they have not alleged that the license "independently produce[d] anticompetitive harms." Accordingly, Amgen's later protected activity cannot be characterized as merely "causally connected" to that

20

harm, as was the case in *Johnson & Johnson*. Any other conclusion would "represent[] hostility to patent rights inconsistent with a modern understanding of intellectual property and competition law." *Id.* at 1096.

*       *       *       *

In short, Plaintiffs cannot use artful pleading to evade the Supreme Court's holding that a plaintiff must allege anticompetitive conduct separate from protected activity in order to state an antitrust claim. *Pennington*, 381 U.S. at 670. If Amgen's alleged wrongdoing includes Amgen's petitioning of the Patent Office and successful litigation, then the First Amendment precludes liability as a matter of law. But if Amgen's alleged wrongdoing does *not* include Amgen's protected activity, then Plaintiffs have not alleged that Amgen did anything that gave it the power to block competition. Either way, Plaintiffs have failed to allege actionable anticompetitive conduct and their Complaint fails to state a claim.

## II. Plaintiffs' Claims Fail Because Their Alleged Injuries Resulted from Court Action

Plaintiffs' claims fail for the additional, independent reason that any alleged injuries were caused by the decisions of the federal courts in the patent-infringement lawsuits. Where alleged "monopolization is the result of valid governmental action, as opposed to private action, no violation of the [antitrust laws] can be made out." *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961). That is because when "anticompetitive harm is caused by the decision of a court [or other government entity], even though granted at the request of a private party, no private restraint of trade occurs because the intervening government action breaks the causal chain." *Andrx*, 256 F.3d at 818; *see also In re Buspirone Pat. Litig.*, 185 F. Supp. 2d 363, 370 (S.D.N.Y. 2002) (when "private parties . . . obtain the anticompetitive effects in question by first convincing the government of the merits of their views and by obtaining a

21

valid and independent governmental decision," the governmental decision "intervenes between the private parties' actions and these anticompetitive results").

Courts routinely rely on this principle to dismiss antitrust cases for failure to allege causation. For example, in *Abbott Laboratories v. Adelphia Supply USA*, 2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017), Abbott was accused of violating the antitrust laws by prohibiting foreign dealers from reselling Abbott diabetes test strips into the United States. The court dismissed that antitrust claim because it had enjoined the sale of those test strips in a trademark-infringement suit. The court explained that the "inability to obtain and sell international test strips [] result[ed] not from any alleged anticompetitive activity, but from Abbott's protected First Amendment activity of filing this underlying trademark infringement law suit and this Court's granting of an injunction prohibiting the sale of diverted international strips in the domestic retail market." *Id.* at *4. The same principle has been widely applied elsewhere.[5]

This principle mandates dismissal here because Plaintiffs' Complaint alleges that the entry of the etanercept biosimilars was prevented by two federal-court injunctions. Compl. ¶¶ 130-133, 142. In the case against Sandoz, after a two-week bench trial the court upheld the validity of the '182 and '522 patents and permanently enjoined Sandoz from launching its product. *Id.* ¶ 133; ECF No. 49-1. The Federal Circuit affirmed, and the Supreme Court denied

---

[5] *See, e.g.*, *Associated Bodywork & Massage Pros. v. Am. Massage Therapy Ass'n*, 897 F. Supp. 1116, 1120 (N.D. Ill. 1995) (dismissing antitrust claim on the pleadings because "where . . . the alleged injury stems from a competitor's success in influencing legislation, that injury is caused by the state legislatures' political decisions, not by the competitor itself"); *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.*, 17 F.3d 295, 300 (9th Cir. 1994) (dismissing antitrust claim alleging that defendant successfully advocated for standards-setting organization to amend code which local governments elected to adopt via legislation); *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026 (3d Cir. 1997) (dismissing antitrust claim by unaccredited law school alleging that American Bar Association had failed to accredit law school because the state, not the ABA, decided that graduates of unaccredited law schools could not take bar exam); *Lawline v. Am. Bar Ass'n*, 956 F.2d 1378 (7th Cir. 1992) (similar).

certiorari.  Compl. ¶¶ 135-136.  Similarly, in 2019, Amgen filed suit against Bioepis, asserting infringement of the '182 and '522 patents before the same district court that decided the Sandoz case.  *See id.* ¶ 140.  In 2021, after the Supreme Court denied certiorari in the Sandoz case, Bioepis consented to the federal court issuing another permanent injunction against it given the futility of pursuing the same patent invalidity arguments that Sandoz had already made and lost through appeals.  *Id.* ¶ 142; ECF No. 49-2.

Here again, the facts of this case distinguish it from *Johnson & Johnson*.  There, the sale of biosimilars was prevented not by a court order but by private litigation settlements.  *Johnson & Johnson*, 2024 WL 3858249, at \*2; *see also id.* at \*15 (observing that "defendants argue that the alleged use of their patents to settle with biosimilar manufacturers is not an actionable source of alleged anticompetitive behavior").  A settlement agreement generally constitutes "private conduct"—"not the result of a court decision" or other petitioning activity—and therefore does "not enjoy *Noerr-Pennington* immunity" afforded to petitions to agencies or the courts.  *Andrx*, 256 F.3d at 818-19.

In this case, by contrast, the barriers to entry of etanercept biosimilars are not private settlements but rather federal-court orders.  Those orders are "intervening government action" that "br[oke] the causal chain" as a matter of law.  *Id.* at 818.  Plaintiffs' claims therefore fail and must be dismissed with prejudice because no amended complaint could change the force of the District of New Jersey's permanent injunctions.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Second Amended Complaint with prejudice.

23

Dated: January 8, 2025

Respectfully submitted,

 /s/ *Stephen E. Noona*
Stephen E. Noona (VSB No. 25367)
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510-1665
Telephone: (757) 624-3239
Facsimile: (888) 360-9092
senoona@kaufcan.com

Jonathan I. Kravis (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500 E
Washington, DC 20001
Telephone: (202) 220-1100
jonathan.kravis@mto.com

Rohit K. Singla (*pro hac vice*)
Justin P. Raphael (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
rohit.singla@mto.com
justin.raphael@mto.com

Faye P. Teller (*pro hac vice*)
Adam R. Lawton (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
faye.teller@mto.com
adam.lawton@mto.com

*Attorneys for Defendants Amgen Inc., Amgen Manufacturing Limited LLC, and Immunex Corporation*

24

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2025, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

       /s/ *Stephen E. Noona*
Stephen E. Noona (VSB No. 25367)
Kaufman & Canoles, P.C.
150 West Main Street, Suite 2100
Norfolk, VA  23510
Telephone: (757) 624-3239
Facsimile: (888) 360-9092
senoona@kaufcan.com

*Counsel for Defendants Amgen Inc., Amgen Manufacturing Limited LLC, and Immunex Corporation*

25