UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

|  |  |
|---|---|
| CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., and CARE-FIRST BLUECHOICE, INC., on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> AMGEN, INC., IMMUNEX CORPORATION, and AMGEN MANUFACTURING LIMITED LLC, <br><br> Defendants. | Civil No. 2:24cv484 |

## <u>ORDER</u>

Pending before the Court are a Motion to Dismiss for Failure to State a Claim (the "Motion") (ECF No. 55) and a Memorandum in Support thereof (ECF No. 56) filed by Defendants Amgen, Inc., Immunex Corporation, and Amgen Manufacturing Limited LLC (collectively, "Defendants" or "Amgen"). The Court has determined that a hearing on the Motion is unnecessary, as the issues for decision are adequately presented in the briefs. *See* E.D. Va. Local Civ. R. 7(J). For the following reasons, the Motion (ECF No. 55) is **GRANTED in part** and **DENIED in part**.

1

# I.    BACKGROUND

## A.    Factual Background

When ruling on a motion to dismiss for failure to state a claim, courts accept a complaint's well-pled factual allegations as true and draw any reasonable inferences in favor of the non-moving party. *See, e.g.*, *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012). The court is "not so bound with respect to a complaint's legal conclusions." *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991) (quoting *District 28, United Mine Workers, Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085–86 (4th Cir. 1979)) (cleaned up). Accordingly, the Court accepts as true the factual allegations made by Plaintiffs Carefirst of Maryland, Inc. ("CFMI"), Group Hospitalization and Medical Services, Inc. ("GHMSI"), and CareFirst BlueChoice, Inc. ("BlueChoice") (collectively, "Plaintiffs" or "CareFirst") on behalf of themselves and all others similarly situated, in their Second Amended Complaint. *See generally* Second. Am. Compl., ECF No. 52 ("Second Am. Compl."). CareFirst brings this case against Amgen, alleging that it unlawfully delayed competition for its blockbuster drug, Enbrel. Second Am. Compl. ¶ 1.

### 1.    *Scientific Background of Etanercept*

The immune system is made up of various cells and antibodies that protect the human body from foreign invaders. *Id.* ¶ 56. One component of the immune system is called a cytokine. *Id.* ¶ 58. Cytokines have a wide range of functions, including initiating immune responses, such as regulating inflammation in the body. *Id.* One of the dozens of cytokines made by the human body is tumor necrosis factor ("TNF").

2

*Id.* TNF is associated with rheumatoid arthritis, psoriatic arthritis, ankylosing spondylitis, and juvenile idiopathic arthritis. *Id.* TNF activates inflammatory pathways by binding to TNF receptors ("TNFRs"). *Id.* ¶ 59. There are two distinct TNFRs that exist naturally on cell surfaces: one with a molecular weight of approximately 55 kilodaltons ("p55"), and another weighing approximately 75 kilodaltons ("p75"). *Id.* Etanercept, the drug at issue in this case, consists of the extracellular region of a p75 TNFR coupled with an antibody. *Id.* ¶ 60. Etanercept renders TNF biologically inactive and thereby reduces inflammatory responses in patients. *Id.* Scientists have also been successful in using the p55 TNFR to inhibit inflammatory immune responses. *Id.* ¶ 63.

### 2. Scientific Breakthroughs to Treat Autoimmune Conditions and Associated Patents[1,2]

Rheumatoid arthritis, psoriatic arthritis, ankylosing spondylitis, and plaque psoriasis are autoimmune disorders which result from malfunctions of the body's immune system that cause it to attack its own cells or tissues. *Id.* ¶ 51. These internal attacks can take various forms, including prolonged inflammatory responses that can damage the body's vital organs. *Id.* As many as 50 million Americans—80% of whom are women—have an autoimmune disease. *Id.* In the mid-1980s, advances in understanding inflammatory diseases generated significant interest developing a drug to render TNF biologically inactive. *Id.* ¶¶ 60–61.

---

[1] CareFirst has provided a helpful "patent tree" which summarizes the evolution of these patent applications and patents. Second Am. Compl. at 23.

[2] This Order uses ECF-generated pagination.

F. Hoffman La-Roche AG ("Roche") is a Swiss multinational healthcare company.[3] In the 1980s, a Roche research team made fundamental contributions to the development of TNFRs. *Id.* ¶¶ 61–62. This Roche team was the first to experimentally prove the existence of two distinct human TNFRs, the p55 and p75, and set out to isolate, purify, sequence, and clone them. *Id.* ¶ 62. In April 1990, the Roche scientists published the amino acid sequences for the p55 TNFR and its encoding DNA. *Id.* In July 1990, Roche published the same for the p75 TNFR. *Id.*

Roche filed three patent applications in Switzerland in 1989 and 1990 which related to the p55 and p75 TNFRs.[4] *Id.* ¶ 64. On August 31, 1990, Roche filed European Patent Application No. 90116707.2 (the "EP '707 Application"), claiming priority to the three earlier applications it had filed in Switzerland which related to the p55 and p75 TNFRs.[5] *Id.* ¶ 64. On September 13, 1990, Roche filed U.S. Patent Application No. 07/580,013 (the "'013 Application"), claiming priority to the EP '707

---

[3] *Our history*, https://www.roche.com/about/history (last visited Sept. 18, 2025). Generally, in evaluating a motion to dismiss under Rule 12(b)(6), the court may not look beyond the pleadings without converting the motion into one for summary judgment. Fed. R. Civ. P. 12(d). However, the court may properly take judicial notice of matters of public record in evaluating a Rule 12(b)(6) motion, so long as these facts are construed in the light most favorable to the plaintiff along with the well-pleaded factual allegations of the complaint. *See Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013).

[4] This includes Swiss Application No. 3319/89 (filed on September 12, 1989), Swiss Application No. 746/90 (filed on March 8, 1990), and Swiss Application No. 1347/90 (filed on April 20, 1990). Second Am. Compl. ¶ 64 n.23.

[5] Patent applications can claim "priority" to an earlier-filed patent application, which allows them to use the date of the earlier-filed application. Second Am. Compl. ¶ 64 n.22.

Application. *Id.* ¶ 65. Roche later abandoned the '013 Application and, on July 21, 1993, filed U.S. Application No. 08/095,640 (the "'640 Application") as a continuation.[6] *Id.* ¶ 66. During Roche's prosecution of the '640 Application, the United States Patent and Trademark Office ("PTO") placed a restriction requirement on the '640 Application: because the '640 Application claimed multiple distinct inventions, related to the p55 and p75 fusion proteins, Roche would be limited to only one of the claimed inventions unless it elected to pursue only claims related to *one* of the fusion proteins in the application. *Id.* Roche decided to pursue claims related to the p55 fusion protein in the '640 Application, which later issued as U.S. Patent No. 5,610,279 (the "'279 Patent"). *Id.* In order to pursue the non-elected claims, i.e., those related to the p75 fusion protein, Roche was required to file separate divisional applications. *Id.* On May 19, 1995, Roche therefore filed two divisional applications: (1) U.S. Patent Application No. 08/444,790 (the "'790 Application"), which would later issue as U.S. Patent No. 8,063,182 (the "'182 Patent"), and (2) U.S. Patent Application No. 08/444,791 (the "'791 Application"), which would later issue as U.S. Patent No. 8,163,522 (the "'522 Patent").[7] *Id.*

---

[6] Filing a patent application as a "continuation" of a previous patent application allows the second patent application to retain the effective filing date of the initial patent application. *In re Owens*, 710 F.3d 1362, 1366 (Fed. Cir. 2013).

[7] Paragraph 66 of the Second Amended Complaint states that the '791 Application issued as U.S. Patent No. 8,163,*192* rather than U.S. Patent No. 8,163,*522*. Second Am. Compl. ¶ 66. The Court considers this a typographical error, as the '522 Patent is consistently referenced throughout the Second Amended Complaint.

3.     *Immunex Obtains License Rights to Roche's Patents*

Immunex Corporation ("Immunex") is a large pharmaceutical company which was acquired by Amgen, Inc. in 2002. *Id.* ¶ 3. In the 1980s, before that acquisition occurred, Immunex was independently researching TNFRs, focusing on the p75 TNFR. *Id.* ¶ 67. In late 1990, Immunex successfully combined the extracellular portion of a p75 receptor with the antibody IgG1—*i.e.* etanercept, which is the active ingredient in Enbrel. *Id.* ¶ 68. Immunex applied for and obtained a series of its own patents directed to etanercept. *Id.* ¶¶ 69–72.[8] On November 2, 1998, the United States Food and Drug Administration (the "FDA") approved Enbrel for the treatment of moderate to severe rheumatoid arthritis. *Id.* ¶ 73. On November 6, 1998, Immunex launched Enbrel in the United States. *Id.* At the time of the launch, Immunex neither owned nor had a license to Roche's EP '707 Application which pertained to p75 TNFRs. *Id.* ¶ 75. While Immunex had its own etanercept-related patents, *see supra* p. 6 n.8, because the EP '707 Application gave Roche *priority* to the technology used to create etanercept, Immunex needed such a license from Roche to continue selling Enbrel. *Id.* ¶¶ 75–77. Immunex therefore sought and obtained from Roche a license to Roche's patent rights, including all "patents and patent applications that issue

---

[8] On May 10, 1990, Immunex filed U.S. Patent Application No. 07/523,635, which issued as U.S. Patent No. 5,395,760 (the "'760 Patent") on March 7, 1995. Second Am. Compl. ¶ 70. It expired on March 7, 2012. *Id.* On February 8, 1995, Immunex filed U.S. Patent Application No. 08/383,229, which issued as U.S. Patent No. 5,605,690 (the "'690 Patent") on February 25, 1997. *Id.* ¶ 71. It expired on February 25, 2014. *Id.* On January 27, 1998, Immunex filed U.S. Patent Application No. 08/346,555, which issued as U.S. Patent No. 5,712,155 (the "'155 Patent") on November 29, 1994. *Id.* ¶ 72. It expired on March 7, 2012. *Id.*

from or that claim priority of Swiss Patent Application Nos. 3319/89, 746/90, and/or 1347/90, including, but not limited to, European Application No. 90116707.2 and U.S. Patent Application No. 07/580,013." (the "Roche Patent Rights"). *Id.* ¶ 76 (citing Second Am. Compl. Ex. 1 § 1.2, ECF No. 52-1).

On September 15, 1999, Roche and Immunex executed a retroactive license agreement (the "1998 License Agreement"), with an effective date of November 6, 1998. *Id.* ¶ 77. Under the 1998 License Agreement, Roche granted Immunex a co-exclusive license (the "1998 License") under the Roche Patent Rights to make, use, sell, and import etanercept worldwide. *Id.* "Co-exclusive" meant that Immunex and Roche each had the right to commercialize etanercept worldwide. *Id.* In other words, in 1998, Roche maintained the right to manufacture etanercept itself or to allow a third party other than Immunex to do so. *Id.* The 1998 License also expressly provided that Roche would retain ownership of the Roche Patent Rights and was responsible at its own discretion for their prosecution and maintenance. *Id.* ¶ 78 (citing Second Am. Compl. Ex. 1 §§ 3.1, 3.4, ECF No. 52-1). Therefore, in 1998, Roche maintained all core patent rights—the right to prosecute, maintain, and enforce the Roche Patent Rights. *Id.* In exchange for the non-exclusive license grant, Immunex agreed to pay royalties of 4% of its net sales of etanercept products. *Id.* ¶ 79 (citing Second Am. Compl. Ex. 1 § 5.2, ECF No. 52-1).

### 4.   *Enbrel's Launch*

When Immunex launched Enbrel in November 1998, it was an immediate blockbuster, earning Immunex $13 million in sales in the United States in its first

few weeks on the market. *Id.* ¶ 80. In its 1998 annual report, Immunex touted Enbrel's launch as a "key milestone event" and predicted that Enbrel would "drive a revenue 'step change' for Immunex" that would "provide substantial cash flow and fuel the company's growth." *Id.* By the end of 1999, Enbrel had become an "unprecedented commercial success for Immunex, with $367 million in U.S. sales." *Id.* ¶ 81. Immunex continued "quarter for quarter" to "set new records for sales of Enbrel." *Id.* ¶ 83. By November 2000, there were more than one thousand patients on a waiting list for the drug, and total sales by year end exceeded $650 million. *Id.* Sales in 2001 increased by 17% to $762 million, cementing Enbrel's launch as the most successful launch in history for a biologic product.[9] *Id.* As Immunex put it, as a "targeted, potent intervention for inflammation, Enbrel has changed the practice of rheumatology." *Id.*

### 5.   *Amgen, Inc. Acquires Immunex*

Amgen, Inc. is an American biopharmaceutical company, and in 2001, it was already the largest biotechnology company in the world. *Id.* ¶¶ 3, 85. In December 2001, Amgen, Inc. announced that it was buying Immunex for $16 billion in cash and stock—the highest sum ever paid for a biotech acquisition. *Id.* ¶ 85. Enbrel was the

---

[9] Biologics include a wide range of products, including vaccines, gene therapies, blood components, and recombinant proteins. Second Am. Compl. ¶ 37. A biosimilar is a drug that is highly similar, but not structurally identical to, a brand-name biologic (referred to as the innovator or reference product). *Id.* ¶ 39. A biosimilar manufacturer may not submit an abbreviated BLA ("aBLA") until four years after the reference product is first licensed, and an aBLA may not be approved until twelve years after the reference product is first licensed. *Id.* ¶ 42. Thereafter, biosimilars are free to compete—subject to lawful patent restraints. *Id.* Here, etanercept is a biologic, Enbrel is Immunex's brand name of that biologic, and competitors to Immunex have produced biosimilars to Enbrel. *Id.* ¶¶ 50, 126–143.

key driver of the deal for Amgen, Inc., which had not launched a significant new drug in a decade. *Id.* ¶ 86. Amgen, Inc.'s new CEO, Kevin Sharer, who took the helm in 2000, had promised investors at least 20% annual growth in sales and earnings per share and revenues of $8–9 billion by 2005. *Id.* Amgen, Inc.'s executives boasted to investors that Enbrel had the potential to generate more than $3 billion in annual sales by 2005, and Amgen, Inc. was "enthusiastic about the long-term potential of Enbrel," which it predicted would reach $3 billion by 2005. *Id.* ¶ 87.

Amgen, Inc.'s acquisition of Immunex, and the impact it was expected to have on the market of drugs used to treat immunological conditions, drew immediate antitrust concerns from government agencies and industry watchdogs. *Id.* ¶ 88. After reviewing the proposed acquisition, the FTC issued a complaint against Amgen, Inc. and Immunex stating that the "effects of the Merger, if consummated, may be to lessen competition and to tend to create a monopoly" in violation of federal antitrust law by, *inter alia*, "reducing innovation" and "eliminating potential competition" in the TNF inhibitor market. *Id.* ¶ 90. Because of the significant difficulty, cost, and time required to develop TNF inhibitors, the FTC concluded that the consolidation of Amgen, Inc.'s and Immunex's "substantial proprietary rights" in this market could "create large and potentially insurmountable barriers to entry." *Id.* Amgen, Inc. and Immunex settled the FTC's antitrust charges by entering a consent order requiring them, *inter alia*, to license certain patents to Serono—a Swiss pharmaceutical company that was "developing a soluble TNF receptor, Onercept, for use in Europe, but [that did] not possess the patent rights necessary to market the product in the United

States"—to ensure the continued development of TNF inhibitors for sale in the United States and "to remedy the lessening of competition" in that market that would result from the acquisition. *Id.* ¶ 91. On July 12, 2002, the FTC announced that it would allow Amgen, Inc's acquisition of Immunex to proceed under the terms of the consent agreement. *Id.* ¶ 92. On July 16, 2002, Amgen, Inc's acquisition of Immunex was completed, giving Amgen, Inc. all rights to Enbrel in the United States and Canada. *Id.*

### 6.    *Amgen Buys the Roche Patent Rights*

Amgen's returns were almost immediate. *Id.* ¶ 94. By December 2002, it had recorded $362.1 million in Enbrel sales; combined with Immunex's sales for the first half of the year, the total 2002 sales of Enbrel exceeded $770 million. *Id.* While Amgen had thus far benefited handsomely from its acquisition of Immunex, and thus Enbrel, it saw a cliff ahead. *Id.* ¶ 100. Absent action, Enbrel could soon face competition from a competing biosimilar etanercept product launched either directly by Roche or by a competing company that could obtain a license to the Roche Patent Rights, as had been reserved by Roche in the 1998 License. *Id.* ¶ 101. Therefore, in June 2004, Amgen bought out all of the Roche Patent Rights that Roche had retained for itself in the original 1998 License. *Id.* The transaction made Amgen the exclusive licensee of the Roche Patent Rights and gave it the ability to resume prosecution of any pending patent applications within the Roche Patent Rights (the "2004 Exclusive License"). *Id.* The agreement also granted Amgen the first right to sue over suspected infringement of the licensed patents at its sole expense and under its sole control—

i.e., Amgen had the right to sue other drug companies whose products, like biosimilar etanercept, Amgen believed infringed the patents. *Id.* ¶ 106.

Therefore, as of 2004, Amgen obtained all rights to control the prosecution of the '790 and '791 Applications. *Id.* ¶ 117. Amgen immediately set out to finish prosecution of those applications. *Id.* For about seven years, Amgen prosecuted the '790 and '791 Applications. *Id.* ¶ 119. On November 22, 2011, the PTO approved the '790 Application and issued the '182 Patent, with an expiration date of November 22, 2028. *Id.* ¶ 121. On April 24, 2012, the PTO issued the '522 Patent, with an expiration date of April 24, 2029. *Id.* ¶ 123.

Prior to Amgen's purchase of the Roche Patent Rights, which eventually resulted in the '182 and the '522 Patents, Amgen already enjoyed significant market exclusivity via its own patents that it had acquired over the years[10] and via the license rights that it had acquired from the 1998 License with Roche.[11] *Id.* ¶ 111–113. Amgen needed nothing further from Roche to be able to commercialize Enbrel without fear of running afoul of Roche's technology and its related intellectual property. *Id.* ¶ 113.

---

[10] *See* U.S. Patent No. 5,606,690; U.S. Patent No. 5,395,760; U.S. Patent No. 5,712,155; U.S. Patent No. 11,491,223; U.S. Patent No. 10,307,483; U.S. Patent No. 8,119,604.

[11] Amgen was enjoying the twelve-year exclusivity period for etanercept under § 351(k)(7) of the Public Health Service Act. which prohibited the FDA from approving any § 351(k) application for a proposed Enbrel biosimilar until November 2, 2010. Second Am. Compl. ¶ 114.

7.     *Amgen Sues Competitors For Infringement of the '182 and '522 Patents*

a.     *Sandoz*

Sandoz, a major pharmaceutical manufacturer, became the first potential Enbrel competitor with its "Erelzi" drug. *Id.* ¶ 126. On September 29, 2015, the FDA accepted Sandoz's aBLA seeking authorization from the FDA to market Erelzi, a biosimilar version of Enbrel (etanercept). *Id.* ¶ 127. Amgen asserted infringement of the '182 and '522 Patents (which were obtained after prosecuting the pending patent applications in the Roche Patent Rights) as well as three of Amgen's own patents, 7,915,225 ("the '225 Patent"), 8,119,605 ("the '605 Patent"), and 8,722,631 ("the '631 Patent") (collectively, the "Psoriasis Patents"). *Id.* ¶ 128. Amgen sought an injunction to prohibit Sandoz from commercializing its biosimilar etanercept prior to the expiry of all the patents. *Id.* Over the course of the litigation, Amgen narrowed its infringement claims against Sandoz to the '182 and '522 Patents, dropping its claims over the Psoriasis Patents and relying exclusively on the patents obtained from the Roche Patent Rights to deny Sandoz access to the etanercept market. *Id.* ¶ 129. On August 11, 2016, and subject to the terms of a confidential stipulation, a United States District Court in the District of New Jersey entered a preliminary injunction prohibiting Sandoz from commercializing its etanercept product (the "*Sandoz* Court"). *Id.* ¶ 130. On August 30, 2016, the FDA approved Erelzi. *Id.* ¶ 131. Given the injunction, however, Sandoz could not launch its biosimilar. *Id.* On September 10, 2018, the *Sandoz* Court entered an order which stated that commercialization of Sandoz's biosimilar etanercept product would infringe upon the '182 and '522 Patents. *Id.* ¶ 132. On

August 9, 2019, after a bench trial, the *Sandoz* Court issued a decision upholding the validity of the '182 and '522 Patents. *Id.* ¶ 133. On July 1, 2020, the Federal Circuit affirmed the *Sandoz* Court's judgment upholding the validity of the '182 and '522 Patents. *Id.* ¶ 135. On May 17, 2021, Sandoz's petition for certiorari to the U.S. Supreme Court was denied. *Id.* ¶ 136. Sandoz therefore has not been able to launch Erelzi to this day. *Id.* ¶ 137.

### b.    *Samsung Bioepis Co., Ltd. ("Samsung")*

On April 25, 2019, the FDA approved Samsung's aBLA for its etanercept product Eticovo, another biosimilar to Enbrel. *Id.* ¶ 139. On April 30, 2019, Amgen sued Samsung, alleging infringement of the '182 Patent and the '522 Patent (the "*Samsung* Case"). *Id.* ¶ 140. Amgen sought an injunction to prohibit Samsung from commercializing its biosimilar etanercept prior to the expiry of the patents. *Id.* The *Sandoz* decisions had a significant impact on the *Samsung* Case. *Id.* ¶ 142. On November 3, 2021, Samsung was permanently enjoined from commercializing any product containing etanercept in the United States. *Id.* This injunction terminates on April 24, 2029, after both the '182 Patent and the '522 Patent expire. *Id.*

### 8.    *Enbrel's Success to Date*

A 2020 investigation of Amgen's pricing of Enbrel by the House of Representatives' Committee on Oversight and Reform found that, since acquiring the rights to Enbrel in 2002, Amgen raised its price 27 times, including by nearly 30% within one 12-month period. *Id.* ¶ 145. By 2020, a 50-mg dose of Enbrel cost $1,414 per unit, $5,556 per month, or $72,240 a year: a 457% increase from the date Amgen acquired

it. *Id.* In total, Amgen has amassed more than $86 billion from cumulative worldwide sales of Enbrel. *Id.* ¶ 3. Enbrel worldwide gross sales exceeded $3.6 billion in 2023. *Id.* ¶ 12. At all relevant times, Amgen's market share in the etanercept market was and remains 100%. *Id.* ¶ 192.

### 9.    *Harms Suffered by CareFirst*

Plaintiff CFMI is a not-for-profit corporation organized and existing under the laws of Maryland. *Id.* ¶ 15. Plaintiff GHMSI is a not-for-profit corporation founded pursuant to an act of Congress, with its principal place of business in the District of Columbia. *Id.* ¶ 16. Plaintiff BlueChoice is a corporation organized and existing under the laws of the District of Columbia. *Id.* ¶ 20. Plaintiffs CFMI, GHMSI, and Blue-Choice are indirect subsidiaries of CareFirst, Inc., a corporation organized and existing under the laws of Maryland. *Id.* ¶ 22. Jointly, Plaintiffs provide or administer health insurance for millions of individuals. *Id.* CareFirst purchases prescription drugs at third-party pharmacies, like CVS, Walgreens, and Rite Aid, where Care-First's health plan members have prescriptions filled. *Id.* ¶ 23. CareFirst incurs substantial costs associated with its members' transactions at these third-party pharmacies. *Id.*

CareFirst alleges that Amgen has substantially affected and continues to substantially affect commerce throughout the United States, causing injury to CareFirst and class members. *Id.* ¶ 36. It claims that Amgen, directly and through its agents, has engaged and continues to engage in activities to suppress competition, drive up brand sales, and fix, raise, maintain, and/or stabilize the price of Enbrel in the United

States. *Id.* CareFirst asserts that this conduct has unreasonably restrained trade and adversely affected the market for the direct sale and purchase of etanercept throughout the United States, including in this district, and continues to do so. *Id.* Because of Amgen's practices, CareFirst claims that purchasers of etanercept in the United States have overpaid at least $3 billion collectively for the drug. *Id.* ¶ 13.

Amgen's monopoly power over etanercept would have expired no later than 2019—and as early as 2016—when Amgen's patents had expired and biosimilars entered the market. *Id.* ¶ 218. Instead, due to Amgen's purchase of the Roche Patent Rights, Amgen's alleged monopoly power over etanercept will extend until April 24, 2029 when the '182 and '522 Patents expire. *Id.*

### B.    Procedural History

On November 25, 2024, CareFirst, on behalf of themselves and all others similarly situated, filed its Second Amended Complaint in this Court. *See generally* Second Am. Compl. Therein, CareFirst brings one federal claim and three state claims for relief. *Id.* ¶¶ 213–711. Count One alleges that Amgen knowingly, willfully, and improperly maintained its monopoly power and engaged in anticompetitive conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. *Id.* ¶¶ 213–227. Count Two alleges that Amgen engaged in monopolization and monopolistic conduct in violation of the laws of thirty states, Puerto Rico, and the District of Columbia. *Id.* ¶¶ 228–246. Count Three alleges that Amgen violated the consumer protection laws of thirty-six states and the District of Columbia. *Id.* ¶¶ 247–487. Count Four alleges that Amgen engaged in inequitable conduct constituting unjust enrichment in

violation of the laws of forty-eight states, Puerto Rico, and the District of Columbia. *Id.* ¶¶ 488–711. This action seeks declaratory and injunctive relief under Sections 7 and 16 of the Clayton Act, codified in 15 U.S.C. §§ 18, 26, and monetary relief pursuant to state laws. *Id.* ¶ 28.

On January 8, 2025, Amgen filed the instant Motion pursuant to Federal Rule of Civil Procedure 12(b)(6), Mot., ECF No. 55, and a Memorandum in Support thereof, Mem. Supp., ECF No. 56 ("Mem. Supp."). On January 29, 2025, CareFirst filed its Response in Opposition to the Motion. Resp. Opp'n, ECF No. 57 ("Resp. Opp'n"). On February 19, 2025, CareFirst filed its Reply. Reply, ECF No. 58 ("Reply"). The Motion is ripe for adjudication.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to seek dismissal based on a plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss for failure to state a claim should be granted if the complaint does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). An adequate claim requires more than a "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A threadbare recitation of the "elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule

12(b)(6) purposes." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). Although the truth of the facts alleged is assumed, and the facts are taken in the light most favorable to the plaintiff, courts are not bound by "legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

A motion to dismiss pursuant to Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," so as to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Fair notice is provided by setting forth enough facts for the complaint to be "plausible on its face" and to "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555, 570 (internal citations and footnote omitted). A complaint may survive a motion to dismiss "even if it appears that a recovery is very remote and unlikely." *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)) (internal quotation marks omitted).

## III.  ANALYSIS

The Court first evaluates CareFirst's federal antitrust claim, monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count One), and then

considers CareFirst's state law claims for monopolistic conduct (Count Two), consumer protection (Count Three), and unjust enrichment (Count Four).

## A.     Federal Antitrust Claim: Monopolization in Violation of 15 U.S.C. § 2 (Count One)

The Court will analyze CareFirst's federal claim in three parts. First, the Court provides an overview of the relevant statutes and doctrines that arise in federal antitrust matters, including the Sherman Act, the Clayton Act, and the *Noerr-Pennington* doctrine. Second, the Court considers whether Plaintiffs have antitrust standing to bring this federal claim as indirect purchasers of Enbrel. Third, the Court analyzes whether CareFirst has stated a claim that Amgen violated the Sherman Act, considering whether CareFirst has sufficiently alleged that: (1) Amgen has monopoly power over the market for etanercept; (2) Amgen's conduct was anticompetitive; and (3) CareFirst suffered an antitrust injury as a result of Amgen's conduct.

### 1.     *Relevant Statutes and Doctrines*

#### a.     *The Sherman Act and the Clayton Act*

In this action, Plaintiffs allege violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and seek declaratory and injunctive relief under Sections 7 and 16 of the Clayton Act, 15 U.S.C. §§ 18, 26. Second Am. Compl. ¶ 28.[12] Adopted in 1890, "[t]he

---

[12] The Second Amended Complaint states, "This action alleges violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and of state antitrust, consumer protection, and related laws. This action seeks declaratory and injunctive relief under Sections 7 and 16 of the Clayton Act, 15 U.S.C. §§ 18, 26, and seeks monetary relief pursuant to state laws." Second Am. Compl. ¶ 28. However, the Court struggles to ascertain, and the pleadings do not address, how Defendants are in violation of *Section 7* of the Clayton Act. "Section 7 of the Clayton Act prohibits mergers and acquisitions 'where in any line of commerce or in any activity affecting commerce in any section of the country,

Sherman Act was enacted to address the unlawful combination of private businesses." *A.D. Bedell Wholesale Co. v. Philip Morris, Inc.*, 263 F.3d 239, 255 (3rd Cir. 2001); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 491 (1940). "The Clayton Act was passed in 1914 against a background of disappointment with the Supreme Court's interpretation of the Sherman Act." *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1282 (7th Cir. 1990). In terms of the relief available upon proving a Section 2 violation of the Sherman Act, "Section 16 of the Clayton Act allows private parties to obtain injunctive relief 'against threatened loss or damage by a violation of the antitrust laws.'" *Steves & Sons, Inc., v. JELD-WEN, Inc.*, 345 F. Supp. 3d 614, 648 (E.D. Va. 2018) (quoting 15 U.S.C. § 26); *see also Kruman v. Christie's Intern. PLC*, 284 F.3d 384, 397 (2nd Cir. 2002) ("The Sherman Act . . . defines substantive standards that prohibit certain forms of anticompetitive conduct by defendants. The Clayton Act . . . sets forth the requirement that a plaintiff must suffer an injury or be threatened with an injury caused by a Sherman Act violation in order to bring suit.")

---

the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.'" *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1083 (N.D. Cal. 2023) (citing 15 U.S.C. § 18). As discussed *infra*, Plaintiffs have not alleged facts to suggest that the merger of two companies or the acquisition of one company by another is part of the anticompetitive conduct at issue here. Lacking any facts in support, the Court declines to consider an alleged violation of Section 7 of the Clayton Act in the analysis that follows and focuses instead on alleged violations of Section 2 of the Sherman Act.

b.    *The* Noerr-Pennington *Doctrine*

The *Noerr-Pennington* doctrine[13] is "an affirmative defense which exempts from anti-trust liability any petitioning activity designed to influence legislative bodies or governmental agencies." *N.C. Elec. Membership Corp. v. Carolina Power & Light Co.*, 666 F.2d 50, 52 (4th Cir. 1981). In other words, conduct which might otherwise be deemed anticompetitive is immune from liability pursuant to *Noerr-Pennington* when such conduct involves petitioning the government. Courts have held that patent prosecutions before the PTO and *inter partes* review proceedings before the Patent Trial and Appeal Board ("PTAB") is "petitioning" conduct which is protected by the *Noerr-Pennington* doctrine. *See, e.g. In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 831 (N.D. Ill. 2020) ("[Defendant's] petitioning before

---

[13] "The *Noerr-Pennington* doctrine is an outgrowth of two anti-trust cases in the 1960s, *Eastern Railroad Conference v. Noerr Freight Co.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The Noerr case came about when the railroads attempted to beat back the competition of the trucking companies in Pennsylvania by conducting adverse publicity campaigns and by petitioning the legislature for anti-trucking statutes. Forty-one trucking companies brought suit, alleging that the railroad association was violating the monopoly provisions of the Sherman Act. The Supreme Court held that activities designed to influence legislation, including publicity campaigns, are protected by the first amendment right to petition. Five years later the Supreme Court decided Pennington. In that case the United Mine Workers (UMW) sued a small mine operator for royalty payments and the operator cross claimed, alleging that the UMW and the large operators conspired to force small operators out of business in violation of federal anti-trust laws. At trial, Pennington presented evidence that the UMW and the large mine operators had jointly approached the Secretary of Labor and the Tennessee Valley Authority in furtherance of their scheme. The Supreme Court held that the district court should have instructed the jury that this legislative petitioning was not illegal." *N. C. Elec. Membership Corp. v. Carolina Power & Light Co.*, 666 F.2d 50, 52 (4th Cir. 1981).

the USPTO and the PTAB is protected by *Noerr-Pennington*.”). Courts have also held that filing lawsuits in courts is protected activity. *See, e.g., Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 399 (4th Cir. 2001) (“*Noerr-Pennington* immunity from antitrust laws extends to petitioning the courts as well.”); *Organon Inc. v. Mylan Pharms., Inc.*, 293 F. Supp. 2d 453, 457 (D.N.J. 2003) (“[*Noerr-Pennington*] has been expanded to include litigation to protect rights such as patents.”). In the instant Motion, Amgen argues forcefully that all the conduct which CareFirst alleges is anticompetitive and in violation of the Sherman Act is actually protected activity pursuant to the *Noerr-Pennington* doctrine. *See, e.g.*, Mem. Supp. at 8 (“[Noerr-Pennington] forecloses liability for the entire series of events alleged in the operative Complaint that resulted in biosimilar versions of Enbrel not being able to enter the market.”).

2.  *Antitrust Standing*

The Court must first consider whether Plaintiffs, as indirect purchasers of Enbrel, have standing to bring antitrust claims against Amgen pursuant to Section 2 of the Sherman Act, and to request declaratory and injunctive relief based on Section 16 of the Clayton Act.[14] Section 16 of the Clayton Act states in pertinent part:

---

[14] “The Supreme Court has defined an indirect purchaser as one who is not the immediate buyer from the alleged antitrust violator, or one who does not purchase the monopolized product directly from the antitrust defendant.” *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169 (8th Cir. 1998) (cleaned up) (citations omitted). While Plaintiffs and Defendants never specifically refer to CareFirst as an “indirect purchaser” in the pleadings, CareFirst alludes to being an indirect purchaser in its Second Amended Complaint. *See* Second Am. Compl. ¶ 18 (“CareFirst BCBS indirectly purchases Enbrel for members of its private healthcare plans[.]”); *see also id.* ¶ 23 (“CareFirst purchases prescription drugs at third-party pharmacies, like CVS, Walgreens, and Rite Aid, where CareFirst's health plan members have prescriptions filled. CareFirst incurs substantial costs associated with its members' transactions at

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . .

15 U.S.C. § 26. Section 4 of the Clayton Act, by contrast, "authorizes treble damages for antitrust violations." *Cia Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 407 (1st Cir. 1985). In *Cia Petrolera*, the First Circuit summarized distinctions that the Supreme Court has drawn between antitrust standing under Sections 4 and 16 of the Clayton Act:

> The [Supreme] Court pointed out that a § 4 claim requires an *injury* to "business or property" that § 16 omits. The Court noted that, by contrast, § 16 provides that "any individual *threatened with injury* by an antitrust violation may . . . sue for injunctive relief against violations of the antitrust laws . . . Plainly, Congress empowered a broader range of plaintiffs to bring § 16 actions because the standards to be met are less exacting than those under § 4; under § 16, a plaintiff need only show a threat of injury rather than an accrued injury.

*Id.* at 407–08. While Congress empowered a broader range of antitrust plaintiffs under Section 16 of the Clayton Act, in *Illinois Brick Company v. Illinois*, the Supreme Court prohibited indirect purchasers, such as CareFirst here, from recovering *antitrust damages* under violations of federal law. *Ill. Brick Co. v. Ill.*, 431 U.S. 720, 745–748 (1977) ("*Illinois Brick*"). However, "[t]he Fourth Circuit has stated that indirect purchasers are not *per se* barred from bringing a claim for *injunctive relief*." *Carefirst of Md., Inc. v. Johnson & Johnson*, 745 F. Supp. 3d 288, 307 (E.D. Va. 2024)

---

these third-party pharmacies.") Therefore, the Court considers CareFirst to be indirect purchasers for purposes of a standing analysis.

("*Johnson*") (emphasis added); *see Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 n.24 (4th Cir. 2002) ("*Illinois Brick*'s indirect purchaser rule, when applicable, bars only compensatory damages relief and does not apply to injunctive relief."). Here, for Care-First to demonstrate antitrust standing, the Court must determine whether Plaintiffs have sufficiently alleged an antitrust injury pursuant to Section 16 of the Clayton Act, which the Court analyzes below and finds that they have. Therefore, Plaintiffs have sufficiently demonstrated antitrust standing.

### 3.    *Alleged Violations of the Sherman Act*

Having found that Plaintiffs have established antitrust standing, the Court turns to whether Plaintiffs have stated a claim for relief pursuant to the Sherman Act. Section Two of the Sherman Act makes it an offense "for any person to monopolize any part of the trade or commerce among the several States." *United States v. Grinnell Corp.*, 384 U.S. 563, 566 (1966) (cleaned up). "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* at 570–71. However, "[a]nticompetitive conduct alone does not establish a monopolization claim. A plaintiff must also connect that anticompetitive conduct to a corresponding antitrust injury." *Johnson,* 745 F. Supp. 3d at 316 (citing *Crawl Space Door Sys., Inc. v. SmartVent Prods., Inc.*, No. 2:19cv320, 2020 WL 13691776, at *5 (E.D. Va. Apr. 28, 2020) (stating that for conduct to be exclusionary "a monopolist's act must have an anti-competitive effect" and it

"must harm the competitive process and thereby harm consumers")). Therefore, the Court will consider: (1) whether Amgen possesses monopoly power in the relevant market; (2) whether Amgen's actions constitute anticompetitive conduct; and (3) whether CareFirst has suffered an injury that resulted from that anticompetitive conduct.

### a.    Monopoly Power

As to the first prong, CareFirst has sufficiently pled that Amgen possesses monopoly power over the sale of etanercept in the relevant market, and Amgen does not appear to dispute that characterization. *See* Second Am. Compl. ¶¶ 177–96 (alleging that Amgen charges supracompetitive prices for Enbrel, has never lowered prices for Enbrel, and that Amgen's market share in the etanercept market is 100%); *see generally* Mem. Supp. (focusing all arguments on the second prong of the Sherman Act and neglecting to dispute CareFirst's allegation that Amgen possesses monopoly power over the sale of etanercept); *see also CoStar Grp., Inc. v. Com. Real Est. Exch. Inc.*, No. 23-55662, 2025 WL 2573045, at *6 (9th Cir. Sept. 5, 2025) ("Because monopoly power is the ability (1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion, evidence of supracompetitive pricing is direct proof of the actual exercise of monopoly power.") (cleaned up). Accordingly, the first prong is easily met.

### b.    Anticompetitive Conduct

As to the second prong, which focuses on anticompetitive conduct, CareFirst alleges that Amgen's acquisition of the Roche Patent Rights alone was

24

anticompetitive conduct in violation of the Sherman Act. Second Am. Compl. ¶¶ 100–116. CareFirst clarifies that "the subsequent prosecution of the '790 and '791 Applications and enforcement of the '182 and '552 Patents issued therefrom *caused anticompetitive harm*," *id.* ¶ 198 (emphasis added), by blocking would-be competitors from launching expensive biosimilar versions of Enbrel, *id.* ¶¶ 125–143.

As an initial matter, numerous courts have grappled with whether each alleged action of anticompetitive conduct should be analyzed separately, or collectively as a "scheme."[15] The Fourth Circuit held in *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC* that alleged anticompetitive conduct should be considered collectively. 111 F.4th 337, 354–55 (4th Cir. 2024) ("[I]t is a misapplication of antitrust doctrine for a court to treat a plaintiff's allegation of anticompetitive conduct as if they were five completely separate and unrelated lawsuits, effectively tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.") (internal quotation marks and citation omitted). However, in *Duke*, the Fourth

---

[15] *See, e.g., In re Humira*, 465 F. Supp. 3d at 833 ("The foregoing raises the question as to what conduct should be considered part of the alleged overarching scheme to destroy competition and what parts should be swept aside as lawful petitioning. There is a risk that by focusing only on each individual action in a series, a broader pattern of anticompetitive conduct might escape policing and remedy. Plaintiffs must be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each, but at the same time, conduct immunized from antitrust liability cannot be aggregated with nonimmunized conduct without nullifying the immunity.") (cleaned up); *Johnson*, 745 F. Supp. 3d at 305 ("The Court will discuss each component of the scheme separately because of the complex factual allegations related to each. However, because plaintiffs have alleged a scheme, and consistent with Fourth Circuit case law, the Court will consider each as part of a single campaign to foreclose competition.") (internal quotation marks and citation omitted).

Circuit was not grappling with whether certain conduct within the scheme was immunized from *Noerr-Pennington*, but rather, whether several acts which on their own might not violate the Sherman Act should be viewed in the aggregate. *Id.* at 355–56. The *Duke* court did not cite to *Noerr-Pennington*. Defendants bristle at CareFirst's attempts to center their allegations on the purchase of the Roche Patent Rights, stating, "Plaintiffs' wordplay, such as editing the word 'scheme' out of their complaint, does not avoid the clear legal rule that the First Amendment forecloses antitrust liability for a course of conduct that depends on petitioning the government." Mem. Supp. at 23.

Here, whether Amgen's actions—purchasing the Roche Patent Rights, prosecuting the '790 Application and the '791 Application, and enforcing the '182 Patent and the '522 Patents in courts—are treated as a scheme or as individual acts, is really of no import, because the *Noerr-Pennington* immunity that Amgen receives for the latter two actions, the prosecution and enforcement, does not immunize Amgen from the allegedly anticompetitive conduct of purchasing the Roche Patent Rights.

To be clear, the Court has no trouble finding, pursuant to *In re Humira*, *Baltimore Scrap*, *Organon*, and dozens of other precedents, that Amgen's prosecution of the '790 Application and the '791 Application, which resulted in the '182 Patent and the '522 Patent respectively, as well as Amgen's patent enforcement lawsuits against Sandoz and Samsung, constitute protected activity pursuant to the *Noerr-Pennington* doctrine. Amgen is immune from antitrust *liability* under the Sherman Act for such acts.

26

However, the Court disagrees with Defendants' contention that the entire scheme is "immunized" because it includes, in part, lawful petitioning activity pursuant to *Noerr-Pennington*. *See, e.g., Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*, 850 F.3d 52, 57 (1st Cir. 2017) ("The mere existence of a lawsuit does not retroactively immunize prior anti-competitive conduct."); *Intel Corp. v. Fortress Inv. Grp. LLC*, No. 19cv7651, 2020 WL 6390499, at *16 (N.D. Cal. July 15, 2020) ("[L]iability cannot be predicated on petitioning activity but if a defendant engages in anticompetitive conduct which does not constitute petitioning activity, it cannot immunize itself from liability for litigation-related damages if it asserts or tries to assert its unwarranted accumulation of market power through litigation.")

Defendants cite numerous cases to suggest that Amgen's immunity "for its petitioning of the Patent Office and of a federal court forecloses liability for the series of events challenged in the Complaint." Mem. Supp. at 20. Amgen goes on to note that, "[t]he Supreme Court has made clear that constitutionally protected petitioning activity 'is not illegal' even '*as part of a broader scheme itself* violative of the Sherman Act.'" *Id.* (quoting *Pennington*, 381 U.S. at 670). The Court agrees with Defendants that, with respect to the series of events currently before the Court, the *petitioning activity* is not illegal—but the acquisition of the Roche Patent Rights remains. The same is true for Defendants' reliance on *Hospital Building Company v. Trustees of Rex Hospital*: "The Fourth Circuit has confirmed that even '[i]f the courts are used or litigation is filed as part of an overall scheme to attempt to monopolize or exclude competition from the marketplace or otherwise violate the antitrust laws, that

27

conduct' still enjoys antitrust immunity." Mem. Supp. at 20 (citing *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 691 F.2d 678, 688 (4th Cir. 1982)). In that context, when the Fourth Circuit refers to "that conduct," it is referring to the *petitioning activity*, not the overall scheme. Defendants next cite *Mercatus Group, LLC v. Lake Forest Hospital* for the proposition that, "Plaintiffs cannot impose liability on Amgen's petitioning activity by combining it with non-immunized conduct. Courts do not 'aggregate the effects of conduct immunized from antitrust liability with the effects of conduct not so immunized' because doing so 'would nullify the immunity.'" Mem. Supp. at 20 (citing *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 839 (7th Cir. 2011)). In citing that case, Defendants left out a crucial sentence which followed:

> That does not mean, however, that we will aggregate the effects of conduct immunized from antitrust liability with the effects of conduct not so immunized. That approach would nullify the immunity. *For that reason, we must first identify any conduct that is immunized. After we do so, we consider the evidence of the remaining challenged conduct in the aggregate to see if it is sufficient to support antitrust liability.*

*Id.* (emphasis added).[16] That is exactly how Plaintiffs have stated their claim here. CareFirst concedes, and the Court agrees, that Amgen cannot face antitrust liability

---

[16] Defendants also point to *Intell. Ventures I LLC, et al., v. Capital One Fin. Corp., et al.*, where Capital One argued that, "IV's aggregation of patents to create market power would support substantial Section 2 and Section 7 claims on its own." 280. F. Supp. 3d 691, 706 (D. Md. 2017). The District Court of Maryland rejected that argument because Capital One's pleadings relied on *a purported campaign*, and the court therefore declined to consider whether the aggregation of patents to create market power could stand on its own to support antitrust liability. *Id.* Here, Plaintiffs allege the opposite—that the acquisition of the Roche Patent Rights on its own supports antitrust liability. Furthermore, this Court is not so moved that a Plaintiff's allegations of a scheme or individual actions is of significant import. "[A] reviewing court must disregard 'labels and conclusions.'" *Wiseman v. First Mariner Bank*, 2013 WL 5375248, at *18 (D. Md. Sept. 23, 2013). The crucial question is instead which parts

for its prosecution of the '790 Application and the '791 Application before the PTO, nor for its enforcement litigation of the '182 Patent and the '522 Patent against Sandoz and Samsung, as such activity is well-established to be petitioning activity under *Noerr-Pennington*. The "remaining challenged conduct" is the acquisition of the Roche Patent Rights, and such alleged anticompetitive conduct does not enjoy immunity under *Noerr-Pennington*. *See also Amphastar*, 850 F.2d at 57 n.3 ("*Noerr* does not retroactively protect unlawful agreements or schemes to acquire, maintain, or jointly exercise market power that defendants subsequently exploit through litigation."); *Premier Elec. Const. Co. v. Nat'l Elec. Contractors Ass'n*, 814 F.2d 358, 376 (7th Cir. 1978) ("There is no such thing as the lawful enforcement of a private cartel.")

---

of the scheme, perhaps all, render Defendants immune from liability pursuant to *Noerr-Pennington*. Finally, Defendants cite *In re Humira*, where the court found that, "Some of [Defendant's] conduct was not immunized by the *Noerr-Pennington* doctrine—including what plaintiffs allege to be the heart of their monopolization claim—but much of what preceded and followed that conduct was immunized, which makes the entirety of alleged monopolization scheme immune, because plaintiffs' theory depends on all the components of [Defendant's] conduct as the means to suppress competition . . . [b]ut even if [Defendant's] nonimmunized conduct is sufficient to be a standalone scheme of monopolization, the complaint still fails for lack of an antitrust injury because it is not plausible that [Defendant's] nonimmunized conduct intimidated the other defendants into delaying the launch of their biosimilars (or otherwise caused any antitrust injury)." 465 F. Supp. 3d at 834–835. The Court declines to follow *In re Humira* for three reasons. First, with due respect to the Northern District of Illinois, that court's holding is not binding upon this Court. Second, the *In re Humira* court did not cite to any authority that supports the finding that an entire scheme is immunized because certain acts within that scheme are immunized pursuant to *Noerr-Pennington*. Third, pursuant to our sister court's holding in *Johnson*, the *In re Humira* court seemingly confuses antitrust liability with antitrust injury. Pursuant to *Johnson*, this Court agrees that just because *Noerr-Pennington*-immunized conduct cannot be the basis for antitrust *liability*, that does not mean such conduct cannot provide the basis for antitrust *injury*.

Having determined that the acquisition of the Roche Patent Rights does not enjoy *Noerr-Pennington* immunity, the Court next must determine whether, at the motion to dismiss stage, the acquisition of *pending patent applications* by a monopolist is sufficient to state a claim of monopolistic conduct under the Sherman Act. Amgen turns its nose up to CareFirst's argument that antitrust laws can be violated by acquisition of pending patent *applications*. *See* Reply at 13 ("Plaintiffs do not cite any case in which a court has recognized a claim that a defendant violated the antitrust laws simply by acquiring rights under pending patent applications."); *see also id.* at 14 ("Plaintiffs have cited no authority that acquiring rights to a patent application alone can be exclusionary conduct.").

While true, Defendants have not cited any authority specifically finding that the acquisition of pending patent applications *does not* constitute an effort to monopolize a market. A theory is not necessarily legally unsound just because it is novel, especially at the motion to dismiss stage. CareFirst cites numerous cases where courts considered pending patent applications and their relevance to Sherman Act violations in the context of a broader patent portfolio or as part of a broader conspiracy or agreement to restrict competition. *See, e.g., ABS Global, Inc. v. Inguran, LLC*, No. 14cv503, 2016 WL 3963246, at *3 (W.D. Wis. July 21, 2016) (denying defendants' summary judgment motions on Sherman Act claims where monopolist acquired two of the four patents at issue by purchasing pending patent applications from Monsanto, stating that the defendant "purchased several pending patent applications related to sexed semen processing from Monsanto Company. Those applications

matured into 24 U.S. patents, including [patents] that remain in suit here.") (cleaned up); *United States v. Singer Mfg. Co.*, 374 U.S. 174, 197–99 (1963) (White, J., concurring) (stating that patent owners violated Sherman Act, among other "concerted actions," when they entered into a "general cross-licensing agreement providing that the parties were not to attack one another's patent applications" nor "do anything to restrict one another's claims in patents or applications"); *Automated Bldg. Components v. Trueline Truss Co.*, 318 F. Supp. 1252, 1259–61 (D. Or. 1970) (finding that company's acquisition of a patent application was part of a conspiracy "to harass defendants and to force defendants out of the truss manufacturing business"); *Mason City Tent & Awning Co. v. Clapper*, 144 F. Supp. 754, 767 (W.D. Mo. 1956) (finding that cross-license agreement which included pending patent applications is "invalid according to Sherman Act Standards."); *United States v. Hartford-Empire Co.*, 46 F. Supp. 541, 620 (N.D. Ohio 1942) (finding acquisition of patent applications part of a "concerted action with others in violation of the anti-trust laws.").[17] While none of these cases specifically comments on the relative value of the patent applications within a patent portfolio or the applications' aggravating value within the context of

---

[17] "Then followed a course of procedure involving a shifting of claims between the patent applications of the two companies in such a manner as to obtain the strongest patents possible. This was done through the joint cooperation of the legal staffs of the two companies. As a result, patents issued virtually as the two cooperating companies desired, and this, of course, set up a distinct handicap to inventors having applications in the Patent Office for patents that might come into competition with those sought by and issued to Hartford. This joint method of action in the Patent Office in order to prevail over their adversaries resulted in distinct advantages to the two companies that otherwise might not have been obtained." *Hartford-Empire*, 46 F. Supp. at 611.

a larger conspiracy of anticompetitive conduct, considering the facts as alleged by CareFirst here, the '790 Application and the '791 Application were enormously valuable to Amgen.[18]

While Defendants also contend that patent applications do not confer exclusionary power, as stated *supra* but which bears repeating here, CareFirst's Second Amended Complaint illustrates just how important and powerful obtaining those patent applications was to entrench Amgen's monopoly in etanercept. Prior to obtaining the Roche Patent Rights, Amgen (then Immunex) already had an agreement with Roche which allowed them to sell Enbrel worldwide: On November 6, 1998, Immunex launched Enbrel. Second Am. Compl. ¶ 75. On September 15, 1999, Roche and

---

[18] *See* Resp. Opp'n at 23–24:

> While only an issued patent confers the right to bring litigation, a patent application is nonetheless a valuable property right. Patent applications, like patents, are transferrable legal interests that can be assigned by written instrument. 35 U.S.C. § 261. The "rights afforded to a patent applicant put him in a strong bargaining position," even if the applicant fails to exercise those rights or the patent never issues. *Keen, Inc. v. Gecker*, 264 F. Supp. 2d 659, 663 (N.D. Ill. 2003) (quoting *Meehan v. PPG Indus., Inc.*, 802 F.2d 881 (7th Cir. 1986)). Courts have recognized that patent applications are sufficiently valuable to be included under the definition of bankruptcy property and subjected to attorney's liens. *See id.*; *In re Engage, Inc.*, 544 F.3d 50, 53c54 (1st Cir. 2008). The filing of a patent application also determines the priority date for any patent that issues from that application or any divisional or continuation applications that claim priority to it, which confers certain exclusionary rights. Since an application becomes invalidating prior art for any subsequently filed applications for the same invention, it can be used as a defense to block the issuance of other patents. 35 U.S.C. § 102(a)(2). An applicant can also, through the filing of an application, provoke an interference with another application or patent or petition to institute a derivation proceeding and thereby exclude other applicants from patenting the same invention. *See* 35 U.S.C. § 135 (pre-AIA); 37 C.F.R. §§ 1.137, 41.202.

Immunex executed the 1998 License Agreement, with a retroactive effective date of November 6, 1998—the date of Immunex's Enbrel launch, which granted Immunex a co-exclusive license to make, use, sell, and import etanercept worldwide. *Id.* ¶ 77. Co-exclusive meant that Immunex and Roche each had the right to commercialize etanercept worldwide. *Id.* The 1998 License also expressly provided that Roche would retain ownership of the Roche Patent Rights and was responsible at its own discretion for their prosecution and maintenance. *Id.* ¶ 78.

Enbrel was an immediate blockbuster, earning Immunex $13 million in U.S. sales in its first few weeks on the market in 1998. *Id.* ¶ 80. In December 2001, Amgen acquired Immunex for $16 billion—the highest sum ever paid for a biotechnology acquisition. *Id.* ¶ 85. From Enbrel's launch in November 1998, through 2004, Immunex and later Amgen reaped monumental benefits from their monopoly in the etanercept market in the United States, enjoying high profit margins generated by supracompetitive pricing and annual price increases. *Id.* ¶ 98. With future sales of Enbrel projected to exceed $3 billion per year, protecting its golden-goose blockbuster became a crucial priority for Amgen. *Id.* Amgen went to work to protect its Enbrel monopoly with a thicket of patents, filing dozens of applications for patents claiming Enbrel manufacturing processes, formulations, methods of use, and administration devices. *Id.* ¶ 99. But Amgen knew none of these patents were likely to prevent competing biosimilars from launching after the expiration of Amgen's key Enbrel patents, which were set to expire in 2012. *Id.* Absent action, Enbrel could soon face competition from a competing biosimilar etanercept product launched either directly by Roche or by a

competing company that could obtain a license to the Roche Patent Rights. *Id.* ¶ 100. So, in June 2004, Amgen bought out all of the Roche Patent Rights. *Id.* ¶ 101. The transaction made Amgen the exclusive licensee of the Roche Patent Rights, gave it the ability to resume prosecution of any pending patent applications included within the Roche Patent Rights, and empowered it to enforce any patents to exclude competitors from the etanercept market.[19] *Id.*

The Court finds it compelling that, in 2004, Amgen was already reaping astronomical profits from Enbrel pursuant to its own patents which were set to expire in 2012, and pursuant to the 1998 License Agreement with Roche. Why then, did Amgen need to additionally acquire the Roche Patent Rights, including the '790 Application and the '791 Application? As held by our sister court in *Johnson*, "a monopolist's acquisition of exclusive rights to patents related to the subject matter of the monopoly can constitute anticompetitive conduct as a matter of law." *Johnson*, 745 F. Supp. 3d at 314. Amgen may be able to offer procompetitive justification for its acquisition of the Roche Patent Rights at a later stage of litigation. That would be "a classic issue of disputed fact." *ABS*, 2016 WL 3963246, at \*19; *see also Johnson*, 745 F. Supp. 3d at 315–16 ("It may very well be true that defendants had a procompetitive reason for

---

[19] Amgen argues vociferously that it prosecuted the '790 and '791 Application before the PTO for seven years before actual patents issued from those applications, and that it was the '182 Patent and '522 Patent which issued that actually allowed Amgen to exclude competitors—not the patent applications themselves. Reply at 6–7. However, "the relevant question is *not* whether the patent acquisitions actually enhanced [the monopolist's] market power, but rather whether they reflect [the monopolist's] intent to *maintain* monopoly power through anticompetitive means." *ABS*, 2016 WL 3963246, at \*19 (citing *Ford Motor Co. v. United States*, 405 U.S. 562, 576 n.11 (1972)).

acquiring Momenta and its patent portfolio, and at a later stage of litigation, defendants may pursue this argument."). But, at this stage, the Court finds that CareFirst has plausibly alleged anticompetitive conduct pursuant to Federal Rule of Civil Procedure 12(b)(6).[20]

### c. *Antitrust Injury*

"Anticompetitive conduct alone does not establish a monopolization claim. A plaintiff must also connect that anticompetitive conduct to a corresponding antitrust injury." *Johnson,* 745 F. Supp. 3d at 316 (citing *Crawl Space Door Sys., Inc. v. SmartVent Prods., Inc.*, No. 2:19cv320, 2020 WL 13691776, at *5 (E.D. Va. Apr. 28, 2020) (stating that for conduct to be exclusionary "a monopolist's act must have an anti-competitive effect" and it "must harm the competitive process and thereby harm consumers")). Plaintiffs must show that "defendant's allegedly anticompetitive conduct was the actual and proximate cause of that antitrust injury." *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 762 (E.D. Pa. 2015). Here, Plaintiffs sufficiently allege that the purchase of the Roche Patent Rights, the prosecution of the '790 and the '791 Application, and the enforcement of the '182 and '522 Patents resulted in permanent court injunctions against Sandoz and Samsung which allowed Amgen to keep its competitors off the market and extend its Enbrel monopoly. Plaintiffs further allege that this created antitrust injury by requiring CareFirst and its

---

[20] The parties also extensively litigate whether the '790 Application and the '791 Application technically covered etanercept at the time that the applications were purchased by Amgen. That is a factual determination which is not relevant to the Court's analysis at the motion to dismiss stage.

class members to pay supracompetitive prices for etanercept. Second Am. Compl. ¶¶ 125–43, 204–08. Such allegations—that patent enforcement resulted in delayed market entry of biosimilars and resulted in supracompetitive pricing—has been upheld by other courts as a sufficient allegation of antitrust injury. *See, e.g., Johnson*, 745 F. Supp. 3d at 308 ("Plaintiffs' alleged injury—the payment of supra-competitive prices for ustekinumab—is undoubtably an injury that the antitrust laws were intended to prevent."); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 534 (D.N.J. Sept. 29, 2004) ("Plaintiffs have alleged that these agreements caused them to pay higher prices for K-Dur, the type of injury that antitrust laws are intended to prevent. Plaintiffs are not required to plead more.")

Amgen argues that, even if the acquisition of Roche's Patent Rights were an antitrust violation that caused a downstream antitrust injury, the "causal chain" was broken by intervening government action—here, the permanent court injunction issued against Sandoz and Samsung by the District of New Jersey. In other words, Amgen argues that because Sandoz and Samsung were enjoined from bringing their biosimilar products to market by the district court, while an antitrust injury indeed may have occurred in-fact, such antitrust injury cannot be attributed to Amgen, but instead to the government.

Defendants cite, and the Court has independently found, several out of circuit cases which seem to stand for the proposition that where the government plays a discretionary role in the antitrust injury, such injury is not actionable. "If anticompetitive harm is caused by the decision of a court, even though granted at the request

of a private party, no private restraint of trade occurs because the intervening government action breaks the causal chain." *Andrx Pharm., Inc. v. Biovail Corp. Intern.*, 256 F.3d 799, 818 (D.C. Cir. 2001). In *Andrx*, the D.C. Circuit acknowledged that it "may be correct that a plaintiff cannot be injured in fact by private conduct excluding him from the market when [government action] prevents him from entering that market in any event." *Id.* at 809 (cleaned up). Later on, although it is not entirely clear whether the court is commenting on immunity from antitrust *liability* versus antitrust *injury*, the court acknowledged that while anticompetitive harms stemming from court decisions might fall under *Noerr-Pennington*, anticompetitive harms stemming from private agreements, such as settlement agreements, would not "enjoy Noerr-Pennington immunity." *Id.* at 819. *MedImmune, Inc. v. Genentech, Inc.* takes a similar approach:

> Where a plaintiff fail[s] to prove that its injuries result from anything other than governmental action, *Noerr-Pennington* immunity will attach. With the exception of the price fixing argument dismissed . . . above, MedImmune has not pled an injury that was the result of the Defendants' settlement agreement. In the absence of government action in resolving priority and issuing the New Cabilly patent, MedImmune would have suffered no harm from the Defendants' settlement. Because the alleged restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, *Noerr-Pennington* immunity applies.

No. 3cv2567, 2003 WL 25550611, at *11 (C.D. Cal. Dec. 23, 2003) (internal citations and quotation marks omitted). The Third Circuit in *A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.* commented directly on whether *Noerr-Pennington* applies to both antitrust liability and antitrust injury:

> Under the *Noerr–Pennington* doctrine, private parties may be immunized against liability stemming from antitrust injuries flowing from valid petitioning. This includes two distinct types of actions. A petitioner may be immune from the antitrust injuries which result from the petitioning itself. Also, and particularly relevant here, parties are immune from liability arising from the antitrust injuries caused by government action which results from the petitioning. Therefore, if its conduct constitutes valid petitioning, the petitioner is immune from antitrust liability whether or not the injuries are caused by the act of petitioning or are caused by government action which results from the petitioning.

263 F.3d at 251, 266–67 (finding that while "plaintiffs properly pleaded an antitrust injury, the right to petition the government is paramount" and holding the defendants immune from anti-trust liability under the *Noerr-Pennington* doctrine).

While some courts appear to have accepted this proposition, the Court finds no support for this stance in the Fourth Circuit. On the contrary, in a recently decided case within this district brought by the same Plaintiffs, the court found that, "[T]here is a distinction between antitrust *liability* and antitrust *injury*. *Noerr-Pennington* stands for the proposition that litigation enforcing lawfully acquired patents cannot serve as a basis for antitrust liability. It does not, however, serve as a bar to asserting that patent enforcement litigation constitutes antitrust injury." *Johnson*, 745 F. Supp. 3d at 317.

Therefore, while recognizing the existing disagreement amongst courts regarding whether *Noerr-Pennington* immunizes antitrust injury which was created in part by government action, absent precedent from the Fourth Circuit and given the recent decision of our sister court, the Court declines to dismiss this case at the motion to dismiss stage, and allows Plaintiffs' federal claim to proceed on the merits. *See, e.g.,* *In re Newbold Corp.*, No. 9cv33421, 2012 WL 5880441, at *8 (W.D.N.C. Nov. 20, 2012)

(finding the law unclear as to the plaintiff's claim and accordingly denying the defendants' motion to dismiss).

*       *       *

In sum, CareFirst has established antitrust standing for injunctive and declaratory relief pursuant to the Clayton Act. CareFirst has also sufficiently pled that Amgen possessed and continues to possess monopoly power and that Amgen's acquisition of the Roche Patent Rights was anticompetitive conduct in violation of the Sherman Act. Finally, Plaintiffs have alleged that it has suffered the type of injury that federal antitrust laws are intended to prevent. Therefore, Amgen's Motion to Dismiss Count One of CareFirst's Second Amended Complaint is **DENIED**.

### B.    State Law Claims: Monopolistic Conduct (Count Two), Consumer Protection (Count Three), and Unjust Enrichment (Count Four)

Count Two alleges that Amgen engaged in monopolization and monopolistic conduct in violation of the laws of thirty states, Puerto Rico, and the District of Columbia.[21] Second Am. Compl. ¶¶ 228–46. Count Three alleges that Amgen violated the consumer protection laws of thirty-six states and the District of Columbia.[22] *Id.*

---

[21] Such states include Alabama, Arizona, California, Colorado, Connecticut, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. Second Am. Compl. ¶ 245.

[22] Such states include Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Louisiana, Massachusetts, Maryland, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, South

¶¶ 247–487. Count Four alleges that Amgen engaged in inequitable conduct constituting unjust enrichment in violation of the laws of forty-eight states, Puerto Rico, and the District of Columbia.[23] *Id.* ¶¶ 488–711. Amgen does not raise any affirmative defenses or arguments with respect to CareFirst's state law claims, arguing only that because Amgen is immunized for its conduct pursuant to *Noerr-Pennington* under federal law, it is also immune "from liability under all manner of state-law business torts.[24] Reply at 4 n.1. The Court, having found that Amgen is not immune under

---

Carolina, South Dakota, Texas, Utah, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming. Second Am. Compl. ¶¶ 263–487.

[23] Such states include Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. Second Am. Compl. ¶¶ 498–711.

[24] In its Motion to Dismiss, Amgen states that, "Plaintiffs' federal and state law claims are premised on the same theory. Plaintiffs allege 'exclusionary, anticompetitive conduct that was designed to create and maintain Amgen's improper monopoly over etanercept and exclude or substantially exclude its biosimilars from the market.'" Mem. Supp. at 18. In CareFirst's Response in Opposition to the Motion to Dismiss, Plaintiffs state, "Amgen does not argue for dismissal of the plaintiffs' claims under state consumer protections laws or assert any statute-specific challenges to the plaintiffs' state antitrust law claims." Resp. Opp'n at 9 n.3. Amgen replied, "As Amgen's motion papers explained, and Plaintiffs do not dispute, all of Plaintiffs' claims 'are premised on the same theory.' ECF No. 56 at 13. Thus, Amgen's motion requests dismissal of the entire Complaint rather than only a subset of claims. *Id.* at 23. Indeed, because the *Noerr-Pennington* doctrine is premised on the exercise of a federal constitutional right, it immunizes Amgen's conduct not only from antitrust liability, but also from liability under all manner of state-law business torts. *See IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003). Likewise, state law cannot undo the effect of federal-court injunctions." Reply at 3–4 n.1.

federal law, turns to whether CareFirst has stated a claim upon which relief can be granted under those state tort laws based upon the facts alleged in the Second Amended Complaint.

### 1.    Preemption

Before determining whether Plaintiffs have sufficiently pleaded the elements of their state law claims, the Court must consider whether those state law claims are preempted by federal law. To so determine, "[t]he Court must assess whether the tort action *is based on conduct* that is protected or governed by federal patent law. If the conduct at issue is protected by federal patent law, the tort action is preempted." *CardioVention, Inc. v. Medtronic, Inc.*, 430 F. Supp. 2d 933, 939 (D. Minn. 2006) (emphasis added). In *Hunter-Douglas*, the Federal Circuit identified two types of conduct where federal patent law immunizes (or preempts) state tort liability: "(1) conduct entirely before the PTO, unless it amounts to fraud and (2) publicization of a patent, unless done in bad faith." *Johnson*, 745 F. Supp. 3d at 319 (citing *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1335–36 (Fed. Cir. 1998)). Here, the anticompetitive conduct alleged is Amgen's acquisition of the Roche Patent Rights. This does not constitute conduct entirely before the PTO, nor does it constitute publicization of a patent. Therefore, the conduct at issue does not fall into either *Hunter-Douglas* category which would require federal law pre-emption over state tort liability. *Johnson*, 745 F. Supp. at 320 (finding the plaintiffs' state-law claims require allegations apart from fraud on the PTO, as "[a]ntitrust claims require a showing of anticompetitive conduct, consumer protection requires proof of consumer deception,

41

and unjust enrichment requires proof of enrichment upon a defendant that would be inequitable to accept or retain."). Therefore, CareFirst's state law claims are not preempted by federal law pursuant to *Hunter-Douglas*.

    2.   *Count Two: Monopolization and Monopolistic Conduct under State Law*

CareFirst alleges that Amgen engaged in monopolistic conduct in violation of the laws of Puerto Rico, the District of Columbia, and thirty states: Alabama, Arizona, California, Colorado, Connecticut, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. First, the Court must evaluate whether CareFirst, as an indirect purchaser of Enbrel, has standing to bring such antitrust claims under state law. Then, the Court will consider whether CareFirst has sufficiently pled the elements of monopolistic conduct under the aforementioned laws of each state.

    a.   *Standing*

"[T]he doctrine of antitrust standing works to distinguish, out of all the parties whose injuries might conceivably be traced to an antitrust violation, which of those parties have recourse under antitrust law." *Davis v. Hanna Holdings, Inc.*, 771 F. Supp. 3d 552, 572 (E.D. Pa. 2025) (internal quotation marks and citations omitted). "It is axiomatic that in determining state law a federal court must look first and foremost to the law of the state's highest court . . ." *Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1002 (4th Cir. 1998). The Supreme Court set forth a test to determine

antitrust standing in *Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), and most states at issue here "apply the factors from *AGC* or use a substantially similar test." *Johnson*, 745 F. Supp. 3d at 322. The Court finds that, as to the states at issue here, the District of Columbia, Alabama, Arizona, California, Connecticut, Illinois, Iowa, Kansas, Maryland, Michigan, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin apply the factors from *AGC* or use a substantially similar test.[25] The remaining states or territories at issue here which apply alternative tests are Puerto Rico, Colorado, Florida, Hawaii, Maine, Minnesota, and North Carolina. The Court will therefore first consider Plaintiffs' state antitrust standing with respect to the states applying the *AGC* test, and then turn to the states applying alternative tests.

### i.    States Applying the *AGC* Test

The five *AGC* Factors are:

(1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended;
(2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws;
(3) the directness of the alleged injury;

---

[25] *See Johnson*, 745 F. Supp. 3d at 322 ("The Court finds that Alabama, Arizona, California, Connecticut, the District of Columbia, Illinois, Iowa, Kansas, Maryland, Michigan, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, and Wisconsin either explicitly apply the factors from *AGC* or use a substantially similar test."); *see also id.* n.23 (finding that while no court in Utah or West Virginia has provided a clear statement laying out an antitrust test, each state has a harmonization provision, which persuaded the Court that the application of the AGC factors in those states was appropriate).

(4) the existence of more direct victims of the alleged antitrust injury; and

(5) problems of identifying damages and apportioning them among those directly and indirectly harmed.

*Kloth v. Microsoft*, 444 F.3d 312, 324 (4th Cir. 2006) (citing *AGC*, 459 U.S. at 537–545) (internal quotation marks and citations omitted). Courts have simplified the first two factors of the *AGC* test and asked simply whether the alleged harm is the correct type of injury. *Johnson*, 745 F. Supp. at 323. The Court has already determined *supra* that CareFirst has suffered an antitrust injury which was the type of injury that antitrust laws are designed to protect against, so the "correct injury" prong is met. The Court will therefore consider whether the last three factors weigh in favor of finding that CareFirst has standing in the states applying the *AGC* test.

The directness of alleged injury weighs in favor of standing. CareFirst alleges that, absent Amgen's monopolistic and unlawful acquisition of the Roche Patent Rights, "at least one biosimilar would have entered the market and lowered the price of [Enbrel]." *Johnson*, 745 F. Supp. at 324. While the injury here still required prosecution of the applications and enforcement of the patents, "because the high price of [Enbrel] is the end goal of the alleged anticompetitive conduct", *id.*, the directness of the injury weighs in favor of standing.

The fourth factor, the existence of more direct victims of the alleged antitrust injury, is best evaluated by considering whether the states at issue have passed *Illinois Brick* repealer statutes. "[T]ypically these [concerns about whether there are more direct victims] carry little weight in the standing analysis in states with *Illinois Brick* repealers." *Johnson*, 745 F. Supp. 3d at 325 (analyzing the fourth *AGC* factor

44

and finding that whether there are more direct victims is of little import in states with repealer statutes, but finding such considerations more relevant amidst *Walker Process* fraud claims); *see also In re Lithium Ion Batteries Antitrust Litig.*, No. 13cv2420, 2014 WL 4955377, at *7 (N.D. Cal. Oct. 2, 2014) ("The issue ultimately is not whether to apply the principles of AGC. The critical issue, rather, is how *repealer* states have chosen to limit indirect-purchaser standing."). As mentioned *supra*, in *Illinois Brick*, the Supreme Court prohibited indirect purchasers, such as CareFirst, from recovering antitrust damages pursuant to violations of federal law. 431 U.S. at 745–748. Then, in *California v. Arc America Corp.*, the Supreme Court provided a carve-out: states could pass laws "repealing" *Illinois Brick*, and state courts could decline to follow *Illinois Brick* as applied to state antitrust laws. 490 U.S. 93 (1989). These statutes or holdings expressly permit indirect purchasers to recover damages for violations of state antitrust laws. *See, e.g.*, Ala. Code § 6-5-60(a) (2025) ("Any person, firm, or corporation injured or damaged by an unlawful trust, combine, or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of $500 and all actual damages[.]"); *Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 102 (Ariz. 2003) (holding that *Illinois Brick* was not binding on Arizona courts). Here, all the states at issue that apply the *AGC* test have passed repealer statutes or its courts have affirmed that *Illinois Brick* does not bar indirect purchasers from bringing claims pursuant to state laws.[26] By way of those statutes

---

26 **District of Columbia**: D.C. Code § 28-4509 (2025); **Alabama**: Ala. Code § 6-5-60 (2025); **Arizona**: *Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 102 (Ariz. 2003) ("Nothing in [the Arizona Antitrust Act] . . . precludes indirect purchasers from

45

and rulings, these states have expressly stated that the existence of more direct victims of the alleged antitrust injury should not preclude standing. Therefore, the Court finds that this factor weighs heavily in favor of antitrust standing.

Finally, the final factor—"problems of identifying damages and apportioning them among those directly and indirectly harmed"—weighs against Plaintiffs here:

> For plaintiffs to succeed on their overcharge claim, they would need to address—among other things—whether the price for [the drug] would have been lower, what the competitor's price for it would have been, and how many competitors would have entered the market and what effect that would have on the price had the alleged anticompetitive conduct not occurred. This is a rather complex and speculative world that plaintiffs find themselves in, which diminishes the justification for granting standing.

*Johnson,* 745 F. Supp. 3d at 325. In this case, such a determination would indeed be complex and speculative. However, given that the majority of the factors weigh in

---

suing."); **California:** Cal. Bus. & Prof. Code § 16750(a) (2025); **Connecticut**: Conn. Gen. Stat. § 35-46a (2025); **Illinois:** 740 Ill. Comp. Stat. Ann. 10/7 (LexisNexis 2025); **Iowa:** *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 445 (Iowa 2002) ("We conclude the Iowa Competition Law creates a cause of action for *all* consumers, regardless of one's technical status as a direct or indirect purchaser."); **Kansas:** Kan. Stat. Ann. § 50-161(b) (2025); **Maryland:** Md. Code Ann., Com. Law § 11-209(b)(2) (LexisNexis 2025); **Michigan:** Mich. Comp. Laws Serv. § 445.778 (LexisNexis 2025); **Mississippi:** Miss. Code. Ann. § 75-21-9 (2024); **Nebraska**: Neb. Rev. Stat. Ann. § 59-821 (LexisNexis 2025); **Nevada**: Nev. Rev. Stat. Ann. § 598A.210 (LexisNexis 2025); **New Hampshire**: N.H. Rev. Stat. Ann. § 356:11 (LexisNexis 2025); **New Mexico**: N.M. Stat. Ann. § 57-1-3 (LexisNexis 2025); **New York**: N.Y. Gen. Bus. Law § 340(6) (LexisNexis 2025); **North Dakota**: N.D. Cent. Code § 51-08.1-08 (2025); **Oregon:** Or. Rev. Stat. § 646.780 (2025); **Rhode Island**: 6 R.I. Gen. Laws § 6-36-7(d) (2025); **South Dakota**: S.D. Codified Laws § 37-1-33 (2025); **Tennessee**: *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 517 (Tenn. 2005) ("We conclude that an indirect purchaser may bring an action under [the Tennessee Trade Practices Act.]"); **Utah**: Utah Code Ann. § 76-16-511 (LexisNexis 2025); **Vermont:** VT. Stat. Ann. tit. 9, § 2465(b) (2025); **West Virginia**: W. Va. Code Ann. § 142-9-2 (LexisNexis 2025); **Wisconsin**: Wis. Stat. § 133.18(1)(a) (2025).

favor of standing, the Court finds that CareFirst has antitrust standing in the states applying the *AGC* test. Therefore, CareFirst has standing to bring the monopolistic conduct state law claims in the District of Columbia, Alabama, Arizona, California, Connecticut, Illinois, Iowa, Kansas, Maryland, Michigan, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

### ii.    States Applying Alternative Tests

For the purposes of analyzing antitrust standing, the remaining states at issue are Puerto Rico, Colorado, Florida, Hawaii, Maine, Minnesota, and North Carolina. Each state applies an alternative test:

- **Puerto Rico**: Indirect purchasers do not have standing to bring antitrust claims in Puerto Rico. *See In re Broiler Chicken Antitrust Litig.*, No. 16cv8637, 2020 WL 4032932, at *4 (N.D. Ill. July 15, 2020) ("Puerto Rico's existing anti-trust law precludes indirect purchasers from recovering for the harm caused by Defendants."). Therefore, CareFirst lacks standing to bring an antitrust claim against Amgen pursuant to Puerto Rican law and that claim is **DISMISSED**.

- **Colorado**: Colorado simply asks whether the Plaintiff has been injured "by reason of the anticompetitive effect of [Defendant's] alleged conduct," similar to federal standing requirements. *Winther v. DEC Intern., Inc.*, 625 F. Supp. 100, 104 (D. Col. 1985). Therefore, because the Court has already determined that CareFirst has antitrust standing under the

federal laws, the Court similarly finds that it has antitrust standing under Colorado's state antitrust law.

- **Florida**: "Florida allows indirect purchasers to bring actions under its consumer protection statute for antitrust violations." *Johnson*, F. Supp. 3d at 322 n. 22 (citing *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 108 (Fla. Dist. Ct. App. 1996)). The Court therefore finds that CareFirst has antitrust standing pursuant to Florida law.

- **Hawaii**: "The Hawai'i Supreme Court has recognized that to establish antitrust standing there must be a direct injury . . . [t]he focus of the standing inquiry, therefore, is on the directness of the injury." *Johnson*, F. Supp. 3d at 325 (citing *Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, Inc.*, 113 Hawai'i 77, 148 P.3d 1179, 1206 (2006)). Having stated above that the Court finds that the directness of the injury weighs in favor of standing, the Court finds that CareFirst has antitrust standing under Hawaiian law.

- **Maine**: In Maine, a trial court indicated that Maine would likely apply the AGC factors, except to the extent that such factors would be in contravention with the legislature's adoption of the *Illinois Brick* repealer. *Knowles v. Visa U.S.A.*, No. 2003cv707, 2004 WL 2475284, at *5 (Me. Super. Ct. Oct. 20, 2004). Given that Maine has passed an *Illinois Brick* repealer statute, the Court finds that CareFirst has antitrust standing under Maine law.

- **Minnesota**: In Minnesota, Minn. Stat. § 325D.57 (2025) provides that any person injured directly or indirectly by antitrust violations can recover three times the actual damages sustained. Such statute also constitutes an *Illinois Brick* repealer statute, and the Court therefore finds that CareFirst has antitrust standing under Minnesota law.

- **North Carolina**: In North Carolina, a Court of Appeals found that North Carolina's antitrust law, N.C. Gen. Stat. § 75-16 (2025), allows indirect purchasers to sue for antitrust violations. *Hyde v. Abbott Labs., Inc.*, 473 S.E.2d 680, 683 (N.C. Ct. App. 1996). The Court therefore finds that CareFirst has antitrust standing under North Carolina law.

Therefore, CareFirst has standing to bring the monopolistic conduct state law claims in Colorado, Florida, Hawaii, Maine, Minnesota, and North Carolina. The monopolistic conduct state law claim (Count Two) as to Puerto Rico is **DISMISSED**.

  *b. Remaining Elements*

Having considered that indirect purchasers have antitrust standing under all the state laws at issue except Puerto Rico, the Court will now consider the remaining elements of those state antitrust laws to determine whether CareFirst has sufficiently stated a claim that the acquisition of the Roche patent applications was in violation of state antitrust laws. The Court finds that that it has. Each state at issue

here, with the exception of Tennessee[27] and Colorado[28], has included a harmonization provision[29] in their state antitrust law, or has Sherman Act "analogues," or its state courts have otherwise stated that state laws should be interpreted in harmony with federal law.[30.] As such, because the Court has already found that the Second

---

[27] Tennessee state law provides that, "All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in trade or commerce affecting this state, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed or which tend to advance, reduce, or control the price or the cost to the producer or the consumer of any product or service in trade or commerce affecting this state, are declared to be against public policy, unlawful, and void." Tenn. Code Ann. § 47-25-101 (2025). The Court finds that CareFirst has, pursuant to Tennessee state law, sufficiently alleged that Amgen entered into a contract with a view to lessen full and free competition in trade or commerce.

[28] Colorado state law provides that "Entering into or engaging in any of the following in restraint of trade or commerce is illegal (a) a contract; (b) a combination in the form of a trust or other form of combination; or (c) a conspiracy." Colo. Rev. Stat. § 6-4-104 (2025). It further provides that, "It is illegal for any person to monopolize, attempt to monopolize, or combine or conspire with any other person to monopolize any part of trade or commerce." Colo. Rev. Stat. § 6-4-105 (2025). The Court finds that CareFirst has, pursuant to Colorado state law, sufficiently alleged that Amgen entered into a contract in restraint of trade and monopolized a part of commerce.

[29] A harmonization provision typically provides that state laws should be construed *in harmony with* prevailing judicial interpretations of federal antitrust statutes.

[30] **District of Columbia**: D.C. Code § 28-4515 (2025) ("In construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes."); **Alabama**: *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 555 n.8 (11th Cir. 1998) (federal antitrust law "prescribes the terms of unlawful monopolies and restraints of trade" pursuant to Alabama law); **Arizona**: Ariz. Rev. Stat. § 44-1412 (LexisNexis 2025) ("courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes"); **California**: *Marin Cnty. Bd. of Realtors, Inc. v. Palsson*, 549 P.2d 833, 835 (Cal. 1976) ("A long line of California cases has concluded that the Cartwright Act is patterned after the Sherman Act and both statutes have their roots in the common law. Consequently, federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act."); **Connecticut**: Conn. Gen. Stat. § 35-44B (2025) ("[T]he courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes."); **Florida**: Fla. Stat. Ann. § 542.32 (LexisNexis

2025) ("due consideration and great weight [should] be given to the interpretations of the federal courts relating to comparable federal antitrust statutes"); **Hawaii**: Haw. Rev. Stat. Ann. § 480-3 (LexisNexis 2025) ("This chapter shall be construed in accordance with judicial interpretations of similar federal antitrust statutes[.]"); **Illinois**: 740 Ill. Comp. Stat. Ann. 10/11 (LexisNexis 2025) ("When the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act."); **Iowa**: Iowa Code Ann. § 553.2 (2025) ("This chapter shall be construed to complement and be harmonized with the applied laws of the United States[.]"); **Kansas**: Kan. Stat. Ann. § 50-163(b) (2025) ("Except as otherwise provided in subsections (d) and (e), the Kansas restraint of trade act shall be construed in harmony with ruling judicial interpretations of federal antitrust law by the United States supreme court."); **Maine**: *Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000) ("We have noted that the 'Maine antitrust statutes parallel the Sherman Act,' and thus have analyzed claims thereunder according to doctrines developed in relation to federal law."); **Maryland**: Md. Code Ann., Com. Law §11-202(a)(2) (LexisNexis 2025) ("[C]ourts . . . [should] be guided by the interpretation given by the federal courts to the various statutes dealing with [antitrust laws.]"); **Michigan**: Mich. Comp. Laws Serv. § 445.784(2) (LexisNexis 2025) ("[T]he courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes[.]"); **Minnesota**: *State by Humphrey v. Alpine Air Prods.,* 490 N.W.2d 888, 894 (Minn. App. 1992) ("Minnesota antitrust law is to be interpreted consistently with the federal courts' construction of federal antitrust law."); **Mississippi**: *Walker v. U-Haul of Miss.*, 734 F.2d 1068, 1070 n.5 (5th Cir. 1984) ("The parties and district court have treated the state and federal antitrust claims as analytically identical. We follow suit."); **Nebraska**: Neb. Rev. Stat. Ann. § 59-829 (LexisNexis 2025) ("[Courts] shall follow the construction given to the federal law by the federal courts."); **Nevada**: Nev. Rev. Stat. Ann. § 598A.050 (LexisNexis 2025) ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes."); **New Hampshire**: N.H. Rev. Stat. Ann. § 356:14 (LexisNexis 2025) ("[C]ourts may be guided by interpretations of the United States' antitrust laws."); **New Mexico**: N.M. Stat. Ann. § 57-1-15 (LexisNexis 2025) ("[T]he Antitrust Act shall be construed in harmony with judicial interpretations of the federal antitrust laws."); **New York**: *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007) (noting that New York's state antitrust law is "generally construe[d]" in light of federal antitrust case law); **North Carolina**: *Hyde v. Abbott Labs., Inc.*, 473 S.E.2d 680, 684 (N.C. Ct. App. 1996) ("Federal case law interpretations of the federal antitrust laws are persuasive authority in construing our own antitrust statutes."); **North Dakota**: N.D. Cent. Code § 51-08.1-02 (2025) and § 51-08.1-03 (2025) (Sherman Act analogues); **Oregon**: OR. Rev. Stat. § 646.715(2) (2025) ("The decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority[.]"); **Rhode Island**: 6 R.I. Gen. Laws Ann. § 6-36-2(b) (2025) ("This chapter shall be construed in harmony with judicial interpretations of comparable antitrust statutes[.]"); **South**

Amended Complaint sufficiently alleges that the acquisition of the Roche patent applications was anticompetitive, the Court finds that CareFirst has sufficiently alleged such monopolistic conduct under the laws of each state at issue as well.

### 3. *Count Three: Consumer Protection*

CareFirst brings consumer protection claims under the laws of the District of Columbia, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Louisiana, Massachusetts, Maryland, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming.

In the Second Amended Complaint, under Count Three, CareFirst first incorporates the preceding sixty-five pages worth of factual allegations. Second Am. Compl. ¶ 247. CareFirst then provides each of the aforementioned states' statutes and factual allegations about how Amgen allegedly violated each statute. *Id.* ¶¶ 248–487. "Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain

---

**Dakota**: S.D. Codified Laws § 37-1-22 (2025) ("[T]he courts may use as a guide interpretations given by the federal or state courts to comparable antitrust statutes."); **Utah:** Utah Code Ann. § 76-16-502 (LexisNexis 2025) ("[T]he courts . . . .will be guided by interpretations given by the federal courts to comparable federal antitrust statutes[.]"); **Vermont**: VT. Stat. Ann. tit. 9, § 2453a(c) (2025) ("[T]he courts of this State shall be guided by the construction of federal antitrust law and the Sherman Act[.]"); **West Virginia**: W. Va. Code Ann. § 47-18-16 (LexisNexis 2025) ("This article shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes."); **Wisconsin**: *Grams v. Boss,* 294 N.W.2d 473, 480 (Wis. 1980) ("We have repeatedly stated that . . . the question of what acts constitute a combination or conspiracy in restraint of trade is controlled by federal decisions under the Sherman Act.")

statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the ground upon which it rests." *Twombly*, 550 U.S. at 545 (cleaned up). The Court finds that CareFirst has more than met that standard here. Accordingly, Amgen's Motion to Dismiss Count Three of CareFirst's Second Amended Complaint is **DENIED**.

### 4. Count Four: Unjust Enrichment

CareFirst brings unjust enrichment claims under the laws of Puerto Rico, the District of Columbia, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

To state a claim of unjust enrichment, "almost all states at minimum require plaintiffs to allege that they conferred a benefit or enrichment upon defendant and that it would be inequitable or unjust for defendant to accept and retain the benefit." *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 541 (E.D. Pa. 2020). Such unjust enrichment claims take one of two forms—either autonomous or parasitic. *Id.* "Autonomous unjust enrichment claims are those that are not derived from a violation of some other state law but rather serve as independent grounds for restitution.

Whereas parasitic claims—as the name suggests—arise from a violation of another state law." *Johnson*, 745 F. Supp. 3d at 331.

As mentioned *supra*, in *Illinois Brick*, the Supreme Court prohibited indirect purchasers from recovering damages for violations of antitrust laws, but in response to this holding many states have passed "repealer statutes" which permit indirect purchasers to recover damages for violations of state antitrust laws. In states that continue to follow *Illinois Brick*, *i.e.*—states where a repealer statute has not been passed, "courts have held that an autonomous unjust enrichment may not be used as an end-run around a state's prohibition against antitrust claims brought by indirect purchasers in accordance with *Illinois Brick*." *In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 703–04 (E.D. Pa. 2014). Therefore, if the state does not follow *Illinois Brick*, both autonomous and parasitic unjust enrichment claims are viable. If the state follows *Illinois Brick* and its unjust enrichment claim is autonomous, it will not survive the motion to dismiss. If the state follows *Illinois Brick* and its unjust enrichment claim is parasitic, such parasitic claim must have another state law claim to which it can attach. Therefore, the only unjust enrichment claims warranting dismissal at this stage are those claims brought in states that follow *Illinois Brick*, and where no other state law claim has survived the motion to dismiss—either the monopolistic conduct claim or consumer protection claim—to which a parasitic claim could attach.

CareFirst brought unjust enrichment claims pursuant to the laws of forty-eight states, as well as Puerto Rico and the District of Columbia. Of those states and

territories, nineteen follow *Illinois Brick* or have not explicitly passed *Illinois Brick* repealer statutes: Alaska, Arkansas, Georgia, Idaho, Indiana, Kentucky, Louisiana, Massachusetts, Missouri, Montana, New Jersey, Ohio, Oklahoma, Pennsylvania, South Carolina, Texas, Virginia, Washington, and Puerto Rico.[31] Of those nineteen states who follow *Illinois Brick*, there are seven states (and one territory) where no

---

[31] **Alaska**: Alaska Stat. § 45.50.577(i) (2025) (stating that the Alaska Attorney General may bring claims of indirect harm); **Arkansas**: Ark. Code Ann. §§ 4-75-212 (2025) (Arkansas Attorney General may bring claims of indirect harm); **Georgia**: *In re Novartis & Par Antitrust Litig.*, 2019 WL 3841711, at *6 (S.D.N.Y. Aug. 15, 2019) (noting that Georgia follows *Illinois Brick*); **Idaho**: Idaho Code Ann. § 48-108(2) (2025) (Idaho Attorney General may bring claims of indirect harm); **Indiana**: Ind. Code § 24-1-2-5.1 (2025) (Indiana Attorney General may bring claims for indirect harm); **Kentucky**: *Arnold v. Microsoft*, No. 2000-ca-2144, 2001 WL 1835377, at *3 (Ky. Ct. App. Nov. 21, 2001) (following *Illinois Brick*); **Louisiana**: *Free v. Abbott Labs.*, 176 F.3d 298, 301 (5th Cir.1999) (following *Illinois Brick*); **Massachusetts**: *Ciardi v. F. Hoffman-La Roche, Ltd.*, 436 Mass. 53, 62 (Mass. 2002) (indirect purchasers cannot bring claim under antitrust law); **Missouri**: *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420, 2014 WL 4955377, at *19 (N.D. Cal. Oct. 2, 2014) (indirect purchasers cannot bring antitrust claims under Missouri law); **Montana**: *Miami Prod. & Chem. Co. v. Olin Corp.*, 546 F. Supp. 3d 223, 246 (W.D.N.Y. 2021) ("[U]nder Montana law, lawsuits by indirect purchasers are barred pursuant to *Illinois Brick*.") (cleaned up); **New Jersey**: *Miami Prod.*, 546 F. Supp. 3d at 237 ("[U]nder *Illinois Brick*, indirect purchasers have no standing to assert a private right of action under the New Jersey Antitrust Act.") (cleaned up); **Ohio**: *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 798 (Ohio 2005) ("[W]e adopt and follow *Illinois Brick*'s direct purchaser requirement and hold that an indirect purchaser of goods may not assert a Valentine Act claim for alleged violations of Ohio antitrust law."); **Oklahoma**: *Major v. Microsoft Corp.*, 60 P.3d 511, 517 (Okla. Civ. App. 2002) (following *Illinois Brick*); **Pennsylvania** (no antitrust statute—so federal antitrust law controls); **South Carolina**: *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 821 (N.D. Ill. 2017) ("South Carolina has not passed an *Illinois Brick* repealer."); **Texas**: *Abbott Labs, Inc. (Ross Labs Div.), v. Segura*, 907 S.W.2d 503, 505 (Tex. 1995) (following *Illinois Brick*); **Virginia**: *In re Novartis and Par Antitrust Litig.*, 2019 WL 3841711, at *6 (S.D.N.Y. Aug. 15, 2019) (finding that Virginia follows *Illinois Brick*); **Washington**: Wash. Rev. Code. Ann. § 19.86.090 (LexisNexis 2025) (state may sue due to indirect injury); **Puerto Rico**: *In re Broiler Chicken Antitrust Litig.*, No. 16-c-8637, 2020 WL 4032932, at *4 (N.D. Ill. July 15, 2020) (finding that Puerto Rico follows *Illinois Brick*).

other state law claim was brought, or no other such claim survives the motion to dismiss: Idaho, Kentucky, Montana, New Jersey, Ohio, Oklahoma, Washington, and Puerto Rico. Therefore, the state law claims for unjust enrichment under the laws of Idaho, Kentucky, Montana, New Jersey, Ohio, Oklahoma, Washington, and Puerto Rico are **DISMISSED** from this action.

As with Plaintiffs' claims for consumer protection, in alleging that Amgen violated state unjust enrichment laws, CareFirst begins by incorporating the preceding 487 paragraphs of allegations. CareFirst then alleges, state by state, that it "conferred a benefit or enrichment upon [Amgen] and that it would be inequitable or unjust for defendant to accept and retain the benefit." *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d at 541; *see also* Second Am. Compl. ¶¶ 488–711. The Court therefore finds that CareFirst has sufficiently stated a claim of unjust enrichment in the states that remain. Amgen's Motion to Dismiss as to all other state law claims for unjust enrichment in the District of Columbia and the remaining forty-one states is therefore **DENIED.**

## IV.    CONCLUSION

For the foregoing reasons, Amgen's Motion (ECF No. 55) is **GRANTED in part** and **DENIED in part**:

1.    Amgen's Motion to Dismiss is **DENIED** in full as to Count One.

2.    Amgen's Motion to Dismiss as to Count Two is **DENIED** as to all states except Puerto Rico. CareFirst's claim for monopolistic conduct in violation of the laws of Puerto Rico is therefore **DISMISSED**.

3.      Amgen's Motion to Dismiss is **DENIED** in full as to Count Three.

4.      Amgen's Motion to Dismiss as to Count Four is **DENIED** as to all states

except Idaho, Kentucky, Montana, New Jersey, Ohio, Oklahoma, Wash-

ington, and Puerto Rico. CareFirst's claims for unjust enrichment in vi-

olation of the laws of Idaho, Kentucky, Montana, New Jersey, Ohio, Ok-

lahoma, Washington, and Puerto Rico are therefore **DISMISSED**.

The Clerk is **REQUESTED** to forward a copy of this Order to counsel of record

for all parties.

      **IT IS SO ORDERED.**


                                          /s/
                             Arenda L. Wright Allen
                       United States District Judge

September 30, 2025
Norfolk, Virginia